Benjamin **GENZER**, Co–executor of the Last Will and Testament of Leo Genzer, deceased, and Charles Heit, Plaintiffs,

v.

Harry B. **CUNNINGHAM**, Otto Eckstein, Charles E. Exley, Jr., Martha W. Griffiths, Ray W. MacDonald, James A. McCullough, Paul S. Mirabito, Ben L. Rouse, Alan E. Schwartz, Robert M. Surdam, Clifton R. Wharton, Jr., DuRay E. Stromback, Harry B. Rottiers, Manuel Garcia, Robert J. O'Connell, Charles W. Peace, Jr., Thomas E. Garvale, A. Finley France, Lloyd William Cali, J. Roy Henry, Price Waterhouse & Co. and Burroughs Corporation, Defendants.

Civ. No. 77–71965.

United States District Court, E. D. Michigan, S. D.

Sept. 26, 1980.

Elwood S. Simon, Southfield, Mich., Sidney Garwin, New York City, for plaintiffs.

Wolfgang Hoppe, Detroit, Mich., for individual defendants.

Brian Sullivan, Detroit, Mich., for Price Waterhouse.

Donald M. Swan, Detroit, Mich., Edwin J. Wesley, New York City, for Burroughs Corp.

## OPINION

GUY, District Judge.

This matter is before the court on defendants' motion to dismiss or for summary judgment in a stockholders' derivative suit brought on behalf of Burroughs Corporation, a Michigan corporation, raising claims

under § 14(a) of the Securities and Exchange Act (SEA) of 1934, 15 U.S.C. § 78n(a) and state law.[1] Plaintiffs complain that during the period 1971 to 1975 certain directors of Burroughs Corporation authorized questionable overseas payments to foreign officials and that the corporation's accountant, Price Waterhouse, had knowledge of the payments.

A Special Litigation Committee consisting of two directors determined that maintenance of this action against either the directors or Price Waterhouse would be contrary to the best interests of the corporation and has recommended that the shareholders' action not be pursued. All defendants claim that this determination is conclusive under the "business judgment rule" and requires dismissal of the action, unless plaintiffs demonstrate that the Special Litigation Committee did not act independently and in good faith in arriving at their decision to terminate the litigation.

## I.

*The Payments*

In 1975, Burroughs' management requested that its independent public accountant, Price Waterhouse, include as part of its regular audits reports of any improper payments or political contributions made in violation of established policy. As a result of these inquiries, senior management was informed that questionable withdrawals had been made by Burroughs' personnel in Country A, that these withdrawals may have been used in connection with questionable payments to local officials or third parties to obtain orders, and that the Price Waterhouse firm in Country A may have been aware of the withdrawals and their purpose.

An investigation was immediately initiated by Price Waterhouse and Burroughs' management. The Board of Directors was informed of the questionable withdrawals on January 6, 1976, at which time they authorized Price Waterhouse to continue

and to expand its investigation for questionable payments on behalf of the company for the five years prior to December 31, 1975. The Securities and Exchange Commission (SEC) was informed of the withdrawals and ongoing investigation on the following day.

On January 21, 1976, the Board of Directors established a Committee on Business Practices which consisted of three outside directors and was empowered to investigate possible questionable payments. The Committee on Business Practices retained the law firm of Cleary, Gottlieb, Steen & Hamilton (hereinafter Cleary–Gottlieb) who had previously done legal work for Burroughs as special outside counsel, and Price Waterhouse as independent accountants to work on the investigation.

The investigation covered the five years ending December 31, 1975, and encompassed operations in the United States and 21 overseas marketing units in twenty countries. Over 300 questionnaires were used to elicit information from officers, directors, key personnel, law firms, and consultants employed by Burroughs. In addition, 56 personal interviews of officers and employees were conducted as was a special review for compliance with the company's Business Practices Policy in the United States and 21 overseas marketing locations. A more detailed investigation was conducted in Country A by Price Waterhouse personnel from their Miami office.

After the detailed report of Cleary–Gottlieb and Price Waterhouse was submitted to the Committee on Business Practices, the Committee formulated its conclusions in a July 28, 1976 report to the Board of Directors which was also filed with the SEC. The Committee concluded that $1,695,000 was improperly withdrawn and presumably used to cover payments, most of which were used to obtain orders for equipment from government entities and some of which were apparently paid to low–level government personnel to facilitate the orders. The withdrawals were found to have been

---

1. Claims raised under § 13(a) of the Securities and Exchange Act were dismissed without op- position at the June 3, 1980 hearing on this matter.

covered by fictitious invoices and a portion of the total figure was used to obtain the fictitious invoices. No former or present officer or director was found to have had knowledge of the payments in Country A. While the report to the Committee reflected that the Price Waterhouse partner in Country A knew of improper deductions relating to the payments taken on the corporate tax return, this was not specifically set forth in the Committee's report. The Committee's report did reflect that amended returns were being prepared.

The Committee also reported that similar payments totalling approximately $550,000 had been made in Countries B and C, and that no officer or director had knowledge of the payments. Finally, the Committee reported that approximately $161,000 in political contributions and approximately $177,000 in other questionable payments had been made in Country D by a joint venture company in which Burroughs had an interest, but that these payments were not known to Burroughs' personnel and no payments were made after Burroughs acquired control of that entity in 1975. Isolated instances of payments were also found to have occurred in four other countries but these were deemed inconsequential.

In addition to the investigation, Burroughs' management took disciplinary action against those Burroughs' personnel directly involved in the withdrawals and those who should have detected or instituted controls to prevent the withdrawals. They also disseminated the Business Practices Policy to employees and established procedures to review compliance with the policy, including establishment of a permanent Committee on Business Practices.

*The Complaint*

On August 11, 1977, Benjamin Genzer, as co–executor of the Estate of Leo Genzer, filed this derivative action against Burroughs' directors, insiders, and accountants.[2] The complaint consists of two counts, the first of which alleges common law and federal securities law claims based on insider trading. The claims in Count I were settled by the parties and dismissed by this court on February 14, 1978. The second count is concerned with the questionable payments described, *supra*, and raises claims against individual directors and Price Waterhouse. Plaintiffs allege that the illegal overseas payments were a waste of Burroughs' corporate assets and the individual director defendants are liable for breach of fiduciary duty owed to the corporation in that they caused, participated in, acquiesced in, knew of, or should have known of the payments. Plaintiffs further allege that the director defendants caused the issuance, from 1971 to 1976, of proxy statements which were false and misleading by failing to disclose the improper payments, and that the proxy statements were sent to shareholders prior to the election of directors and approval of Price Waterhouse as corporate accountant for those years. Plaintiffs allege that Price Waterhouse breached its contract with Burroughs by failing to conduct its audits in accordance with generally accepted auditing procedures and by willfully withholding information of improper payments from the shareholders, the New York Stock Exchange, and the SEC.

In addition to demanding that defendants account to Burroughs for the amount of the illegal payments and expenses incurred as a result of the payments, plaintiffs demand that the election of the directors be set aside for the years 1971–1976, and that Price Waterhouse return all fees paid to it.

*The Motions*

Burroughs and the four individual director defendants who have been served have filed these motions for summary judgment with regard to all claims in Count II alleged against them, or, alternatively, for dismissal of the federal securities law claims. They contend that they are entitled to summary judgment as to all claims, whether based on state common law or federal law, because the Special Litigation

---

**2.** In December, 1979, the court allowed Charles Heit, a Burroughs shareholder, to intervene as a party plaintiff, when it appeared that there may have been a possible break in Mr. Genzer's continuous ownership of shares.

Committee has made a good faith business judgment that these claims should not be pursued in the form of a derivative action on behalf of the corporation. In the alternative, they contend that the cause of action based on § 14(a) fails to state a claim upon which relief can be granted and should be dismissed pursuant to F.R.Civ.P. 12(b)(6).

Price Waterhouse moves for summary judgment on the basis of the Special Litigation Committee's good faith business judgment that the derivative claim should not be maintained against them as a non–director third party defendant. It also argues that the complaint fails to state a claim upon which relief can be granted, that there are no genuine issues as to any material fact, and that Price Waterhouse is entitled to summary judgment as a matter of law.

## II.

In *Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), the Supreme Court addressed the question of when the business judgment rule can be used to dismiss a shareholder derivative action based on violation of a federal statute. In *Burks*, the Court was faced with the question in the context of a business judgment dismissal of a derivative suit against directors brought under the Investment Company and Investment Advisors Acts of 1940, 15 U.S.C. § 80a–1 *et seq.*; 15 U.S.C. § 80b–1 *et seq.*

While the Court found that the scope of a federal right is a federal question, it observed that state law is not irrelevant and the federal courts are not authorized to fashion a complete body of federal corporation law. Rather, "congressional legislation is generally enacted against the background of existing state [corporation] law" and should not "be replaced simply because a plaintiff's cause of action is based on a federal statute." *Id.* at 478, 99 S.Ct. at 1837. According to *Burks*, a court faced with this question must first inquire as to whether the relevant state law permits disinterested directors to terminate derivative actions. Since Burroughs is a Michigan corporation, the parties are in agreement that the law of Michigan must be consulted in that regard.

*State Law*

Whether there can be a "business judgment dismissal" of shareholder suits against directors is a question which has recently been addressed by several courts, but has not been ruled on by any Michigan court. Consequently, this court must predict what the Michigan Supreme Court would do if faced with this problem. *Cole v. Cardoza*, 441 F.2d 1337 (6th Cir. 1971).

Corporate directors who are charged with managing the business and affairs of the corporation have traditionally been protected by the common law business judgment rule. In discussing the rule, Justice Brandeis stated in *United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263–264, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917):

> Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders. Courts interfere seldom to control such discretion *intra vires* the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment.

The Michigan Supreme Court which recognizes this rule as part of the common law of Michigan has stated that the courts will "interfere with the business judgment of corporate directors; ... only if there has been so clear an abuse of discretion as to amount to legal waste." *Good v. Modern Globe, Inc.*, 346 Mich. 602, 609–10, 78 N.W.2d 199, 203 (1956). *See also, Wagner Electric Corp. v. Brake Co.*, 269 Mich. 560, 257 N.W. 884 (1934). Furthermore, it is well established that a duly authorized committee of the board can act as the full board in determining the affairs of the corpora-

tion. Michigan Business Corporation Act §§ 527 and 528; M.C.L.A. §§ 450.1527 and 450.1528.

Defendants argue that since the decision as to whether the corporation should institute litigation is part of the conduct of the business affairs of the corporation, a decision that a derivative action, which is a suit brought on behalf of the corporation, should not be maintained is protected by the business judgment rule. In support of their interpretation of Michigan law as applied to this case, defendants cite several recent cases which have upheld the business judgment dismissal of derivative claims by a special committee. *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979); *Abbey v. Control Data Corp.*, 603 F.2d 724 (8th Cir. 1979); *Lewis v. Anderson*, 615 F.2d 778 (9th Cir. 1979). They argue that the Michigan courts would follow this "clear trend" in corporate law particularly where, as here, there is no allegation of self–dealing on the part of the directors. Finally, they argue that the directors and not the court or a minority shareholder are best suited to determine whether litigation is in the corporation's best interests.

Plaintiffs respond that the business judgment rule was never intended to enable a committee of the board of directors to block a properly instituted derivative action. While the shareholders must demand that the board begin the suit or show that a demand would be futile, they maintain that this is no more than a procedural prerequisite to instigating the action and, once the requirement is met without success, the derivative suit may proceed. While acknowledging the "trend" in corporate law pointed out by defendants, plaintiffs state that the trend has recently been resisted by several courts. *Maldonado v. Flynn*, 413 A.2d 1251 (Del.Ch.1980); *Zauber v. Murray Savings Assoc.*, 591 S.W.2d 932 (Tex.Civ.App.1979); *Sonics International, Inc. v. Dorchester Enterprises*, 593 S.W.2d 390 (Tex.Civ.App. 1980); *Maher v. Zapata Corp.*, 490 F.Supp. 348 (S.D.Tex.1980); and *Abella v. Universal Leaf Tobacco, Inc.*, 495 F.Supp. 713 (E.D. Va.1980). Plaintiffs state that the new application of the business judgment rule is an unnecessary mechanism to prevent frivolous cases because such actions are subject to dismissal or summary judgment, and the Michigan Business Corporation Act provides that the court can charge the plaintiff with costs and attorneys fees. The important right of shareholders to bring derivative cases should not be frustrated by a new application of an old rule.

For the following reasons, the court finds that the Michigan Supreme Court would recognize the application of the business judgment rule as urged by defendants in this case and, upon finding that a special committee of disinterested directors has determined in good faith after a thorough investigation that it is not in the company's best interests to allow an action to proceed, would not allow the courts to interfere with the committee's determination.

In 1972, the Michigan legislature enacted the Michigan Business Corporation Act, P.A.1972, No. 284; M.C.L.A. §§ 450.1101–450.2099, which the legislators declared in part "shall be liberally construed and applied to promote its underlying purposes and policies which include: (a) to simplify, clarify and modernize the law governing business corporations."

Prior to its effective date, Michigan commentators discussed the intent of the then proposed Act as being:

[T]o make Michigan competitive with the major commercial states in the race to attract corporate business. The Act's objective, of course, is to appeal to those who make decisions for the corporation—the incorporators, directors and officers. They will naturally be attracted by corporation laws which afford them flexibility, opportunities for financial reward, reasonable insulation from attack by stockholders or others, and, perhaps most importantly, indemnification from the corporation if actions are filed against them as officers or directors.

Sullivan and Young, *Officers and Directors*, 18 Wayne L.Rev. 951 (1972).

In discussing shareholder rights under the Act, another commentator observed that "[t]he Act follows the New York statute which addresses itself in detail to the problems that the New York courts have faced in handling shareholder derivative actions." Moscow, *Shareholder Rights*, 18 Wayne L.Rev. 1003, 1033 (1972). While the author noted that the Act does not contain the New York security for costs provision to discourage derivative actions, it empowers the court to award expenses and attorneys fees if it finds the action was brought without reasonable cause. The author stated at 1034:

> Derivative actions brought under the Act will have the benefit of a statutory framework and New York precedents for guidance. In a proper case, the Act preserves the shareholder derivative action as an important protection for the shareholder.

In *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979), the Court of Appeals of New York determined that the business judgment rule applied to the termination of a shareholder derivative suit in which the plaintiff alleged that four directors and their accountant were liable to the corporation for illegal payments in the United States and abroad. After an investigation was conducted, a committee of three directors concluded that pursuit of an action against the defendants was not in the corporation's best interests and should be dismissed. The court reasoned 419 N.Y. S.2d at 927, 393 N.E.2d at 1000:

> Derivative claims against corporate directors belong to the corporation itself. As with other questions of corporate policy and management, the decision whether and to what extent to explore and prosecute such claims lies within the judgment and control of the corporation's board of directors. Necessarily such decision must be predicated on the weighing and balancing of a variety of disparate considerations to reach a considered conclusion as to what course of action or inaction is best calculated to protect and advance the interests of the corporation. This is the essence of the responsibility and role

of the board of directors, and courts may not intrude to interfere.

In opposition, plaintiffs rely heavily on *Maldonado v. Flynn*, 413 A.2d 1251 (Del.Ch. 1980), where the trial court rejected the result reached in *Auerbach* as an incorrect application of the business judgment rule and concluded that the determination of a special litigation committee that a shareholder derivative action should not be maintained cannot prevent the shareholder from proceeding. While the highest court of Delaware has not yet ruled on the question presented, and the Michigan Supreme Court would not be bound by the decision of a Delaware court, the ruling by Vice Chancellor Hartnett is an indication that the new application of the business judgment rule is indeed a matter of debate and controversy.

Nevertheless, this court finds that if faced with the factual situation at bar, where, unlike in *Maldonado*, there is no allegation of personal gain by the directors, the Michigan Supreme Court would be guided by the legislature's declaration that the Michigan Business Corporation Act should be liberally construed to modernize corporate law and keep pace with the other major commercial states, and would follow the lead of the New York courts in allowing a business judgment dismissal of litigation determined by a disinterested committee to be contrary to the corporation's best interests.

Plaintiffs express concern that permitting application of the business judgment rule to the circumstances presented in this case will be the death knell of shareholder derivative suits, and that consequently important rights will go unprotected. The court, however, cannot agree particularly where, as in the present case, there has been no suggestion that the plaintiffs are prohibited from maintaining individual actions against the defendants with regard to at least some of the claims asserted. (See further discussion of this point, *infra*.) While the cases cited to the court by plaintiffs all deal with circumstances where a committee of the board of directors has

recommended dismissal of the shareholder litigation, the court does not accept plaintiffs' skeptical view that whenever a special litigation committee is formed it will automatically dismiss the shareholders' action. Furthermore, the action of the board or its committee will always be subject to scrutiny by the courts if the action is found not to be in the corporation's best interests, and if that determination is found to have been made other than independently and in good faith, the action will be allowed to proceed. The court is aware that application of the business judgment rule to circumstances where a committee is charged with the responsibility of determining whether shareholder litigation should continue is an expansion of the traditional rule. At the same time, however, the court is persuaded that the Michigan Supreme Court would adopt the rule as a natural extension of the traditional rule which recognized that the directors are in the best position to determine whether litigation is in the corporation's best interests.

The court finds further support for this result in § 545 of the Michigan Business Corporation Act, M.C.L.A. § 450.1545, which permits a committee of the board to ratify transactions between the corporation and a director so long as the committee is informed of the facts and the interested director's vote is not counted.

Additionally, the Michigan Supreme Court has long recognized a doctrine akin to the business judgment dismissal in the context of derivative litigation against a third party who is neither an officer nor director. In *Futernick v. Statler Builders, Inc.*, 365 Mich. 378, 112 N.W.2d 458 (1961), the court found that a decision by the board of directors that a claim should not be pursued against a third party is conclusive absent a showing of fraud or abuse of trust. The court stated at 387, 112 N.W.2d at 462:

> The minimum requirements for such a suit are proof of fraud or abuse of trust in the board of directors of the corporation in failing or refusing to enforce a corporation right or claim, *plus* demand on said board by the stockholder for such

action or proof that the demand would be useless. (Emphasis added.)

Finally, the court finds support for its decision in the consistent rulings of two respected federal courts of appeals. *Abbey v. Control Data Corp., supra,* and *Lewis v. Anderson, supra.*

Since the court has determined that Michigan law would permit a business judgment dismissal of derivative claims based on questionable payments, *Burks v. Lasker, supra,* directs the court to next determine whether application of that rule to the federal claims raised in this case is consistent with the policy underlying the federal statute involved here, that is, § 14(a) of the SEA.

*Consistency With Federal Policy*

■ In discussing whether a state law authorizing a business judgment termination of a federal derivative claim is consistent with the policy underlying the federal statute, the *Burks* Court stated 441 U.S. at 479, 99 S.Ct. at 1837:

> The [federal statute], therefore, [does] not require that federal law displace state laws governing the powers of directors unless the state laws permit action prohibited by the Acts, or unless "their application would be inconsistent with the federal policy underlying the cause of action. . . ." (Citations omitted).

The court would first observe that § 14(a) of the SEA does not prohibit business judgment dismissal of claims brought under that section. This is in sharp contrast to § 16(b) of the SEA, 15 U.S.C. § 78p(b), which permits the company or any security holder suing on its behalf, to recover any "short swing" profits from corporate insiders, officers and directors. Section 16(b) specifically authorizes shareholder suits to be instituted if the board of directors fails or refuses to bring the suit on behalf of the issues. *See, Burks v. Lasker, supra,* n.13, 99 S.Ct. 1840.

The question then becomes whether, while not specifically prohibited by the Act, application of the business judgment rule would be inconsistent with the federal poli-

cy underlying § 14(a). The Court stated in *Burks* in this regard at 479–80, 99 S.Ct. at 1838:

Although "[a] state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation," federal courts must be ever vigilant to insure that application of state law poses "no significant threat to any identifiable federal policy or interest . . . ." And, of course, this means that "unreasonable" or "specific" aberrant or hostile state rules will not be applied. The "consistency" test guarantees that "[n]othing that the state can do will be allowed to destroy the federal right" and yet relieves federal courts of the necessity to fashion an entire body of federal corporate law out of whole cloth. (Citations omitted.)

In *Burks*, the Court found that the ICA and the IAA were intended to control conflicts of interest between inside directors and the mutual funds. It found that independent outside directors' dismissal of derivative claims against the inside directors was not inconsistent with the policies underlying the statute which gave the outside directors special responsibilities as "independent watchdogs."

In *J. I. Case Co. v. Borak*, 377 U.S. 426, 431–32, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964), the Supreme Court described the policies underlying § 14(a):

The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that "[f]air corporation suffrage is an important right that should attach to every equity security bought on a public exchange." H.R.Rep.No.1383, 73d Cong., 2d Sess., 13. It was intended to "control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . [had] frustrated the free exercise of the voting rights of stockholders." *Id.* at 14. "Too often proxies are solicited without expla-

nation to the stockholder of the real nature of questions for which authority to cast his vote is sought." S.Rep.No.792, 73d Cong., 2d Sess., 12. These broad remedial purposes are evidenced in the language of the section which makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security . . . registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

In addition to finding that an individual private right of action exists for violation of § 14(a), the *Borak* court found that a derivative right of action must be inferred because in many instances derivative actions may be the only means to privately redress § 14(a) violations. The Court further stated that the fundamental character of a claim of proxy violation is federal and its importance may sometimes override otherwise applicable state law. The Court observed that "if the law of the State happened to attach no responsibility to the use of misleading proxy statements, the whole purpose of the section might be frustrated." *Id.* at 434–35, 84 S.Ct. at 1561.

Plaintiffs argue that well–pleaded, non–frivolous § 14(a) claims can never be subject to a business judgment dismissal because the policy of full disclosure would be frustrated. While there may be cases in which a business judgment dismissal of claims that directors have violated the proxy solicitation rules is not consistent with the policy of full disclosure which is necessary for the ultimate goal of shareholder protection, the court finds that allowing dismissal of the action is not inconsistent with those policies within the meaning of *Burks v. Lasker* for the following reasons.

In spite of the obvious importance of enforcing the rights protected by § 14(a), two courts of appeals have recently determined that a good faith business judgment dismissal of § 14(a) claims by a committee of disinterested directors is consistent with

the policies underlying that section. In *Abbey v. Control Data Corp., supra,* the court was faced with a factual situation almost identical to the one at bar. In that case, the plaintiffs argued that they would not have voted to elect certain officers or grant certain stock options if they had known about illegal foreign payments. As in this case, there was no indication that any director was involved or had contemporaneous knowledge of the payments, and the court affirmed the district court's dismissal of the action, concluding that plaintiffs' § 14(a) claim was "at best marginally related to the federal policies underlying [the] section." Similarly, in *Lewis v. Anderson, supra,* plaintiff claimed that the manner in which approval of stock option plans which benefitted the director defendants was obtained violated § 14(a) of the SEA. While the trial court reserved for trial the issue of the good faith, disinterestedness, and independence of the special committee of directors who moved to dismiss the case, the court stated that:

> Allowing disinterested directors to exercise their business judgment to dismiss what they see as groundless causes of action would in no way weaken the regulatory provisions of the federal securities laws. So long as those accused of manipulating the proxy vote are excluded from deciding whether or not to pursue the claim there is no conflict between the business judgment rule and § 14(a).

The courts of appeals thus emphasized two factors in concluding that the business judgment dismissal is not inconsistent with the policies underlying § 14(a): (1) that the claims presented were weak, and (2) that the decision to terminate the action was made by non–defendant disinterested directors. With regard to the first factor, the court finds that the propriety of a business judgment dismissal of a § 14(a) claim should not depend solely on the strength or weakness of the allegations made. Claims that are obviously without merit are subject to dismissal under F.R.Civ.P. 12(b)(6) or summary judgment pursuant to F.R.Civ.P. 56(c), and to limit application of a business judgment dismissal to those circumstances would only create cumulative methods of disposing of the same cases. Furthermore, to the extent that the application of the rule turns solely on the strength of the claims presented, the parties would be required to conduct what could amount to mini–trials on the merits, which could defeat the purpose of the business judgment dismissal rule which recognizes that it may not be a sound business decision for the corporation to pursue to litigation a particular claim in spite of the fact that it has arguable merit. Insofar as the second factor is concerned, the court is not required to rule in this case that *all* derivative § 14(a) claims are subject to a business judgment dismissal based on the decision of a committee of non–defendant directors, and specifically declines to do so. While neither of the considerations enunciated by the courts of appeals is therefore necessarily conclusive in and of itself, the court finds that both are factors which should be taken into account in determining whether pursuit of this derivative claim should be controlled by the Special Litigation Committee's determination that this litigation is not in the corporation's best interests.

On the facts of this case, the court finds that even though plaintiffs may have an arguable claim to set aside the elections of certain directors which is not subject to dismissal based on the authority of *Weisberg v. Coastal States Gas Corp.,* 609 F.2d 650 (2d Cir. 1979), the court further finds that those claims are very weak because it is obvious that the gravamen of plaintiffs' complaint is concerned with the illegal payments themselves, and not the election of certain individuals. In that regard, the court would observe that plaintiffs' allegations of the directors' contemporaneous knowledge of and participation in the payments are not supported by the record. Viewing the evidence in the light most favorable to plaintiffs reveals that it is possible that directors Exley and Rouse could have discovered the payments if they had reviewed in detail the reports passing over their desks, but there is no indication that they had actual knowledge of the payments.

There is also no indication that any of the other directors had any knowledge of the payments whatsoever. Furthermore, Mr. Exley is no longer with Burroughs in any capacity and Mr. Rouse is no longer a director. Thus, the action to set aside their election to the board has become moot. Additionally, the court has reviewed the improper payments cases cited by the parties and is aware of no action in which a plaintiff has succeeded on a § 14(a) claim alleging failure to disclose improper overseas payments regardless of the type of relief requested, and is aware of no case surviving a rule 12(b)(6) motion where participation and coverup on behalf of the defendant directors has not been pleaded. For these reasons, the court concludes that plaintiffs' claims are not likely to succeed, particularly where there is no allegation of personal gain to the directors involved, other than a possible indirect gain resounding to them by virtue of the fact that the payments may have achieved their intended purpose and provided Burroughs with more orders and income, a benefit which would accrue to all shareholders, including plaintiffs.

Similarly, the reasoning of the two courts of appeals supports a finding that application of the business judgment rule would not be inconsistent with the federal policies underlying § 14(a) because as in those cases the decision to dismiss this case was made by a committee of directors who are not named as defendants in the action and were not directors at the time the allegedly defective proxy statements were issued. The disinterested independence of the committee and their good faith will be discussed, infra.

In addition to the reasons given in the two courts of appeals' decisions, this court finds further support for the ruling that the policies underlying § 14(a) are not undermined by application of the business judgment dismissal in this case in the Burks case itself. In Burks, the Supreme Court determined that a business judgment dismissal is not always inconsistent with the goal of shareholder protection which is the ultimate purpose of the ICA and IAA, and is the object to which § 14(a) is ultimately directed as well.

Furthermore, application of the business judgment rule in the circumstances presented in this case would not amount to a situation where it could be said that state law "attaches no responsibility to the use of misleading proxy statements" which, in the words of the Borak decision, would frustrate the purpose of the statute. Finding that it is not in the best interests of the corporation to maintain a § 14(a) cause of action does not necessarily mean that the rights sought to be enforced will go unprotected. While the Borak Court stated that a derivative action may be the only means to privately redress § 14(a) violations, plaintiffs herein have not even suggested that they could not maintain an action in their own behalf. In fact, the case upon which they rely as precluding outright dismissal of their claims, Weisberg v. Coastal States Gas Corp., supra, was apparently an individual action. See also, Maldonado v. Flynn, 485 F.Supp. 274, 281–82 (S.D.N.Y.1980). As the Burks Court observed in footnote 6, 441 U.S. at 479, 99 S.Ct. at 1837 n.6:

This is not a situation where federal policy requires uniformity, and therefore where the very application of varying state laws would itself be inconsistent with federal interests. In enacting the ICA and IAA, Congress did declare that "the activities of such companies, extending over many States, ... make difficult, if not impossible, effective State regulation of such companies ...." 15 U.S.C. § 80a–1(a)(5). But as long as private causes of action are available in federal courts for violation of the federal statutes, this enforcement problem is obviated. The real concern, therefore, is not that state laws be uniform, but rather that the laws applied in suits brought to enforce federal rights meet the standards necessary to insure that the "prohibition of [the] federal statute ... not be set at naught," Sola Electric Co. v. Jefferson Co., 317 U.S. 173, 176, 63 S.Ct. 172, 173, 87 L.Ed. 165 (1942). The "consistency" requirement described in text guarantees that state laws failing to meet these stan-

dards will be precluded. (Citations omitted.)

In summary, the court finds that in light of the inherent weakness of the plaintiffs' § 14(a) claims and the fact that there is no indication that plaintiffs are not otherwise unable to pursue this action individually, application of the business judgment rule to dismiss this case is not inconsistent with the policies of disclosure and shareholder protection where it is determined by a committee of non-defendant directors that the action is not in the corporation's best interests and should be terminated.

### III.

■ The court must finally consider whether the defendants have established, as a matter of law, that the Special Litigation Committee acted independently and in good faith in recommending that the derivative claims be dismissed relative to all defendants. As the court stated in *Auerbach v. Bennett, supra*, 419 N.Y.S.2d at 927, 393 N.E.2d at 1001:

> The business judgment rule does not foreclose inquiry by the courts into the disinterested independence of those members of the board chosen by it to make the corporate decision on its behalf—here the members of the special litigation committee. Indeed the rule shields the deliberations and conclusions of the chosen representatives of the board only if they possess a disinterested independence and do not stand in dual relation which prevents an unprejudicial exercise of judgment.

■ Plaintiff challenges the "formation of the Special Litigation Committee, its good faith and independence, as well as its anonymity from Burroughs' shareholders during its two years of existence." (Plaintiffs' Brief in Opposition to Motion for Summary Judgment, at 50).

The court finds that there is no triable factual issue as to the disinterestedness and independence of the committee itself. The Special Litigation Committee consisted of two directors, Arthur R. Seder, Jr. and James C. Fletcher. Both were appointed to the board by the board of directors in May, 1977. On September 28, 1977, the board of directors passed a resolution which created the Special Litigation Committee, vesting it with "all the power and authority of the Board of Directors" to investigate the allegations raised in the second cause of action in the *Genzer* case "to determine the position that the Corporation shall take with respect to the said derivative claims alleged on its behalf." (Exhibit 18 to Affidavit of Bertram Bronzaft.) Mr. Seder is the chief executive officer of American Natural Resources Company and had no previous relationship to Burroughs prior to his election to the board. Dr. Fletcher is a professor at the University of Pittsburgh and is a consultant. He acted as a paid consultant to Burroughs during the year ending December 31, 1977. The Detroit law firm of Dahlberg, Mallender & Gawne (hereinafter Dahlberg) was chosen as special counsel for the Special Litigation Committee, one reason for the choice being the firm's independence due to absence of prior associations with Burroughs or its directors.

Plaintiffs question Dr. Fletcher's independence due to his contacts with Burroughs as a paid consultant. Dr. Fletcher, however, had no connection with Burroughs during the time of the alleged payments, was not appointed as a director prior to May, 1977, and is not named as a defendant in this case. *See, Galef v. Alexander*, 615 F.2d 51 (2d Cir. 1980). Furthermore, Mr. Seder discussed this with both Dr. Fletcher and the Special Litigation Committee's independent legal counsel and concluded that this connection would not affect Dr. Fletcher's independence or qualification to serve on the committee. The court finds that this does not raise a genuine factual issue so as to require a trial on the issue of the committee's independence. In fact, plaintiffs concede both Mr. Seder and Dr. Fletcher are "unquestionably individuals of unique stature and accomplishment." (Plaintiffs' Brief at 2.) Their main concern appears to be that "the entire procedure is, nevertheless, illogical, unfair and contrary to fundamental concepts that we deem absolutely

necessary to the resolution of litigation under our system of jurisprudence," (Plaintiffs' Brief at 3), a conclusion with which this court does not agree.

Plaintiffs also argue that the motivation and independence of the Special Litigation Committee is necessarily brought into question where the members are appointed by their peers, who are defendants in this action. The court finds that argument to be without merit for the reasons set forth in *Auerbach v. Bennett, supra,* 419 N.Y.S.2d at 928, 393 N.E.2d at 1002:

> [T]o disqualify the entire board would be to render the corporation powerless to make an effective business judgment with respect to prosecution of the derivative action. The possible risk of hesitancy on the part of the members of any committee, even if composed of outside, independent, disinterested directors, to investigate the activities of fellow members of the board where personal liability is at stake is an inherent, inescapable, given aspect of the corporation's predicament. To assign responsibility of the dimension here involved to individuals wholly separate and apart from the board of directors would, except in the most extraordinary circumstances, itself be an act of default and breach of non–delegable fiduciary duty owed by the members of the board to the corporation and to its shareholders, employees and creditors. For the courts to preside over such determinations would similarly work an ouster of the board's fundamental responsibility and authority for corporate management.

Plaintiffs also challenge the good faith of the Special Litigation Committee in arriving at its decision that the litigation should be terminated chiefly because of reliance on the Business Practices Committee's report where Price Waterhouse participated with Cleary–Gottleib in investigation of the questionable payments. Plaintiffs contend that an independent firm should have been used and the failure to do so is a fatal flaw to any findings of the Special Litigation Committee. In support of their claim that Price Waterhouse could not possibly have

done a thorough and objective job, plaintiffs point to a statement of a member of Cleary–Gottleib at an April 1, 1976 meeting of the Business Practices Committee that although another accounting firm might have been preferable, if there were no other contrary consideration, given the circumstances and the use of a Price Waterhouse unit from outside Country A to run the investigation, Cleary–Gottleib was satisfied with Price Waterhouse's participation in the investigation. (Affidavit of Bertram Bronzaft, ¶ 49–50.) Plaintiffs further reference the failure of the investigation to uncover questionable payments made in Country E during the period of time that payments were being made elsewhere. Finally, plaintiffs suggest the Special Litigation Committee recommended dismissal of the § 14(a) claims in their Supplemental Report only because of a recommendation from the defendants.

The Special Litigation Committee which was created on September 28, 1977, met approximately a dozen times prior to issuance of its report on July 26, 1978, and its supplemental report dated September 5, 1979. After retaining Dahlberg as independent Detroit counsel, the Special Litigation Committee determined that J. Donald McLeod of that firm would investigate the facts, apply the law as he understood it, and make recommendations which together with business considerations would be the basis for the Special Litigation Committee's determination. The procedures which the committee would follow were derived from materials supplied by Mr. Rottiers, Burroughs' chief legal counsel at the time, and after conversations with Mr. McLeod, it was decided that Mr. Seder would act as chairman of the Special Litigation Committee. A major concern of the Special Litigation Committee was the amount of reliance which could be placed on the Business Practices Committee's report and prior investigation in light of Price Waterhouse's participation in the investigation and the Price Waterhouse–A partner's knowledge of the payments in Country A. Mr. McLeod undertook the investigation of Price Waterhouse's involvement and reported to the

Special Litigation Committee that the partner's knowledge "did not in any way impede the Investigation, or affect its thoroughness or objectivity." (Confidential Report to Special Litigation Committee, at 12; Exhibit A to Affidavit of Kenneth L. Miller.) This conclusion was based on the fact that an office other than Price Waterhouse–A or Price Waterhouse–US had conducted the investigation in Country A, the fact that there had been no effort to hide the Price Waterhouse–A partner's knowledge of the payments, and additional interviews Mr. McLeod conducted with Price Waterhouse partners, Cleary–Gottleib, and Burroughs personnel. Based on the McLeod interviews, the circumstances surrounding the payments, and the previously obtained interviews and questionnaires, the Special Litigation Committee concluded that reliance on the investigation was proper and it would not be helpful to conduct a second investigation.

Dahlberg's report to the Special Litigation Committee dated March 3, 1978, concluded that the firm did not recommend commencing any litigation on the basis of the payments and that they would have made the same recommendation in 1976. They advised that a successful action could not be maintained against any Burroughs officer, director, or employee for participating in or condoning the practice of illegal payments in Country A or against Price Waterhouse for failure to disclose a business practice having such a remote bearing on the company's worldwide operations. The firm stated that a determination as to the §§ 13 and 14 claims was not warranted because the assertions as to those claims granted no rights to Burroughs as such.

With regard to the claims made against the directors, the Special Litigation Committee noted that it was possible that directors Exley and Rouse could have discovered the payments if they had reviewed in detail the reports passing over their desks. However, they noted that Mr. Exley is no longer with Burroughs and Mr. Rouse is no longer a director. There was no evidence that these former directors had actual knowledge of any improper payments and

actual knowledge should not be inferred in hindsight. As concerned the other defendant directors, there was no indication that any of them had any knowledge of the payments whatsoever. With regard to the claims raised against Price Waterhouse, the Special Litigation Committee found that the accountants would probably raise several defenses to an action brought against them such as the relatively small amount of funds involved considering Burroughs total operations, the fact that they felt that higher Burroughs personnel knew of the payments, the fact that the payments were made to obtain additional revenue and not for personal gain, and the fact that Price Waterhouse–A was a separate partnership operated by nationals of that country.

The Determination and Report of the Special Litigation Committee, dated July 26, 1978, concluded:

[I]t is the determination of this Committee that it is not in the best interests of Burroughs and all of its stockholders, taking account of all the circumstances applicable, that Burroughs maintain, or that there be maintained in the name of Burroughs, any action or proceeding seeking recovery from the employees, officers, and directors, third party commission recipients, or Price Waterhouse, arising out of the third party commissions paid in Country A.

In arriving at this conclusion, we have taken into account the views of Dahlberg, Mallender & Gawne, and have in addition thereto applied as directors our business judgment with respect to the overall posture of Burroughs, its best interests, and those of all its stockholders.

While neither we nor Dahlberg, Mallender & Gawne concluded that it would be impossible to structure a complaint which would pass the stage of a Motion for Summary Judgment, it is our judgment that the indemnification provisions of Michigan law and of the By–Laws of Burroughs, the impact on employee morale, the very small likelihood of any success, the ultimate serious limitation on the claim of damages arising from the

fact that the improper payments were add–ons to billing to customers, our own conclusion that the Investigation was desirable and produced benefits for Burroughs (even though triggered by the disclosures in respect of Country A), the expenditure of significant management and director time in the maintenance of any such litigation and possible adverse consequences arising out of maintenance of any suit against Price Waterhouse, all militate against the institution or maintenance of any such litigation.

(Exhibit B, at 21–22, to Affidavit of Kenneth L. Miller.)

In late September, 1978, management was informed that there may have been questionable payments in Country E during 1971 to 1975. This was disclosed to Burroughs' Audit Committee and to the SEC in November, 1978. A February 14, 1979 report of Burroughs' internal auditor indicated that a special investigation revealed improper payments in Country E of approximately $1,228,000 during the ten year period between 1968 and 1978. The Audit Committee retained Deloitte Haskins & Sells to review the General Auditor's investigation, who concluded on March 12, 1979, that the investigation had been "sufficiently comprehensive." (Exhibit 27 to Affidavit of Bertram Bronzaft.)

Dahlberg prepared a Supplemental Confidential Report to the Special Litigation Committee, dated June 27, 1979, and the Special Litigation Committee prepared a supplement to its report dated September 5, 1979. The Special Litigation Committee found that the failure to discover the practices in Country E was not due to lack of thorough investigation by the Business Practices Committee, Cleary–Gottleib, and Price Waterhouse but, rather, because of stonewalling by personnel who knew of the Country E withdrawals and consequently there was no need to repeat the prior investigation. The Special Litigation Committee noted that the same legal analysis applied even in light of the new information and reached the same conclusion, i. e., that it was not in the company's best interests to pursue the matter. The Special Litigation Committee also noted in the Supplemental Report that Dahlberg had advised it that an arguable claim could be made under § 14(a), contrary to the firm's prior opinion, but concluded that no litigation should be maintained in any case.

The court finds that the Special Litigation Committee's investigation of the claims was thorough and conducted in good faith and that there is no factual issue in dispute which would require a trial on the issue of good faith at this juncture. As the Special Litigation Committee indicated, particular attention was accorded the involvement of Price Waterhouse in the prior investigation. While plaintiffs suggest that an independent accountant may have been preferred, the extra care with which the Special Litigation Committee looked into Price Waterhouse's participation at that stage satisfies the court that their determination in that regard was not "so *pro forma* or half–hearted as to constitute a pretext or sham." *Auerbach v. Bennett, supra,* 419 N.Y.S.2d at 929, 393 N.E.2d at 1003.

Similarly, plaintiffs' suggestion that the subsequent discovery of questionable payments in Country E serves to buttress the claim that Price Waterhouse's participation was a fatal flaw to reliance on the Business Practices Committee investigation and report does not prevent a finding that the Special Litigation Committee's determination was made in good faith. Not only Price Waterhouse, but also Cleary–Gottleib were involved in that investigation, and Cleary–Gottleib was satisfied with Price Waterhouse's participation. Furthermore, after the payments were discovered by the internal auditors, an independent auditor determined that the investigation was sufficiently comprehensive. After discovery of the additional payments the Special Litigation Committee reconsidered its position and still determined that litigation should not be pursued. Nothing but plaintiffs' bare assertions to the contrary weighs against finding that that decision was not made in good faith after a thorough investigation.

Finally, the court finds that the Special Litigation Committee's statement that one of the "parties" suggested that there might be liability based on the § 14(a) claims, contrary to Dahlberg's prior opinion, did not destroy the independence of the investigation. Regardless of where the "suggestion" came from, Dahlberg independently analyzed the suggestion and recommended that the claims be covered by the Special Litigation Committee's report, which was done. Evaluating the complaint was within the scope of the Special Litigation Committee's authority and the only reason why the § 14(a) claims had not been covered in the prior report to the Special Litigation Committee was the opinion of counsel that the facts of the case would not support a derivative claim. If that were true, a business judgment evaluation of whether those claims should be prosecuted would have been unnecessary as they could not have been maintained in any case. There is no doubt that all of the claims raised by Count II of the complaint were within the scope of the Special Litigation Committee's authority to consider and determine what position should be taken relative to them.

█ The standard for granting summary judgment is a strict one in that the movant must conclusively show that there is no genuine issue as to any material fact and the evidence with all inferences to be drawn from it must be read in the light most favorable to the non–movant. Furthermore, the movant's papers are to be carefully scrutinized while those of the non–movant are to be viewed indulgently. While summary judgment should be granted only with extreme caution because it operates to deny a litigant his day in court, it is a useful and efficient device for deciding cases in appropriate circumstances. *Smith v. Hudson*, 600 F.2d 60 (6th Cir. 1979). The non–movant should not be able to rest on mere conclusory allegations or denials to overcome a convincing presentation by the movant, but rather he must present an affirmative indication that his version of the events is not fanciful. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980).

Plaintiffs have had the benefit of extensive discovery in this case on the issue of the good faith of the Special Litigation Committee and its determination, and this discovery has necessarily extended to include inquiry as to the merits of the claims raised as well. In addition to the documents generated in the course of the investigations by the Business Practices Committee and the Special Litigation Committee, plaintiffs have deposed a Price Waterhouse partner and Mr. Seder, the chairman of the Special Litigation Committee. Despite these efforts, the court finds that plaintiffs have failed to unearth any evidence which suggests that there is a triable issue as to the good faith and independence of the Special Litigation Committee which would flaw their determination that the suit should not be maintained in the exercise of their business judgment.

Accordingly, the motions of the individual defendants, Burroughs, and Price Waterhouse for summary judgment are granted.