James Otis Roberts, a shareholder[1] and former employee of Alabama Power Company, filed this derivative action on behalf of the nominal defendant, Alabama Power Company, alleging that the individually named defendants engaged in the following acts which injured the Company and shareholders:
 1) the transfer of the plaintiff from a position of supervisory responsibility to a non-supervisory position;
 2) the gratuitous absorption of expenses incurred in installing underground electrical facilities at Eastdale Mall, Montgomery, Alabama;
 3) the gratuitous rendition of services to then State Senator Fred Jones; and
 4) the gratuitous rendition of services to Alabama Christian College in Montgomery, Alabama
The plaintiff later amended his complaint to allege that the defendants' action in transferring him to a non-supervisory position was violative of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.; that the defendants had violated Code 1975, § 37-8-24 by absorbing the Eastdale Mall installation costs and providing gratuitous services to Alabama Christian College; and that the rendition of gratuitous services to Senator Fred Jones violated Code 1975, § 36-25-6
and § 37-8-24. A claim for injunctive relief was also included
The individual defendants and Alabama Power filed motions to dismiss. The trial court, pursuant to Alabama Power's motion, limited discovery to the issue of whether the action could be maintained as a derivative shareholders' action. Subsequently, Alabama Power moved for a summary judgment based on the action of the board of directors and on the action of the "independent" committee appointed by the board *Page 631 
of directors, in recommending the suit be dismissed. Plaintiff later amended his complaint to eliminate his claim based on age discrimination. It appears he did so after a jury in federal court had decided that issue against him
On January 31, 1980, the Court granted Alabama Power's motion for a summary judgment. The basis for granting the motion was:
 "(1) The Plaintiff is not a `fair and adequate' representative of the stockholders of Alabama Power Company as required by Rule 23.1 of the Alabama Rules of Civil Procedure and/or (2) the `outside' directors of Alabama Power Company, who constitute three fourths of the entire Board, unanimously made a good faith determination, after an extensive investigation, that this litigation was not in the best interest of the Company."
The first issue raised on appeal is whether the trial court correctly ruled that the "business judgment" rule authorized dismissal of the derivative action. It is the position of the plaintiff that the "business judgment" rule cannot preclude him from maintaining this derivative action because the directors' decision not to pursue the claims on behalf of Alabama Power was without the scope of their authority and therefore invalid The plaintiff asserts that the proper application of the "business judgment" rule is at trial on the merits where the individual defendants could use the rule to insulate themselves from individual liability
The plaintiff, in his brief, gives a proper statement of the "business judgment" rule as follows:
 "[Corporate management is vested in the board of directors.] If in the course of management, directors arrive at a decision, within the corporation's powers (intra vires) and their authority, for which there is a reasonable basis, and they act in good faith, as the result of their independent discretion and judgment, and uninfluenced by any consideration other than what they honestly believe to be the best interests of the corporation, a court will not interfere with internal management and substitute its judgment for that of the directors to enjoin or set aside the transaction or to surcharge the directors for any resulting loss."
Quoting H. Henn, Law of Corporations, § 242 (2d ed. 1970) Whether the application of the above rule can be used to terminate a shareholder's derivative suit has never been presented to this Court. However, the question has been litigated quite often in recent years, in both federal and state courts, with varying results. The trend has been to allow the "business judgment" rule to act as a complete bar to derivative suits, especially where the decision of the board is based on the recommendation of a committee of disinterested directors. Gall v. Exxon Corporation, 418 F. Supp. 508 (S.D N Y 1976), and Abbey v. Control Data Corporation, 460 F. Supp. 1242
(D. Minn. 1978), aff'd 603 F.2d 724 (8th Cir. 1979). The trend has been weakened considerably recently by cases in Delaware and Texas. Maldonado v. Flynn, 413 A.2d 1251 (Del.Ch. 1980), and Maher v. Zapata Corporation, 490 F. Supp. 348
(S.D.Tex. 1980). Maldonado and Maher held that the board of directors could not dismiss a derivative suit by reliance on the "business judgment" rule. Maher appears to be the first federal court case to so hold. Against this rapidly fluctuating backdrop, this Court must decide which line of cases it will follow
As this question has never been presented to this Court, we first look to any statutory authority the board of directors might have had to terminate a derivative suit
Code 1975, § 10-2A-57 says that ". . . . the business and affairs of a corporation shall be managed under the direction of a board of directors except as may be otherwise provided in this chapter or the articles of incorporation." The board is also authorized by Code 1975, § 10-2A-64, to delegate matters to a committee of directors and such committee shall exercise the same authority as the board of directors except as to certain fundamental actions that only the board can act upon While the above statutes do not speak directly to the authority *Page 632 
of the board of directors to dismiss a derivative suit, it makes apparent the broad discretion the board has in regard to corporate affairs
Having found no applicable statute, we turn to decisions of other jurisdictions and the rationale they employ
The strongest support for the plaintiff's position can be found in the Maldonado case, cited previously. In Maldonado, certain officers and directors of Zapata Corporation had been granted options to buy Zapata common stock. Subsequently, the board of directors accelerated the date of exercise of the options to allow the directors a tax savings. Maldonado, a shareholder, brought a derivative suit claiming the directors, by accelerating the option exercise date, had breached their fiduciary duty to the corporation and had cost the corporation a tax deduction equal to the amount that the directors had saved on taxes. Four years after suit was brought, the directors appointed a committee of two outside, newly appointed directors who were independent of management. After an investigation, the committee determined the litigation was not in the best interest of the corporation and instructed the corporate counsel to seek dismissal of the suit. In support of its motions for dismissal and for summary judgment, the corporation asserted that a disinterested committee of directors could compel the dismissal of the derivative suit when, in the committee's business judgment, discontinuance of the action was in the best interest of the corporation
The Court of Chancery of Delaware held that the "business judgment" rule was irrelevant to the issue of whether the stockholders have a right to bring an action on behalf of the corporation to rectify a breach of fiduciary duty where the corporation refuses to act. The Court went on to state that "[U]nder our system of law, courts and not litigants should decide the merits of litigation."
We cannot agree entirely with the decision of the Delaware Court. Maldonado seems to stand for the proposition that anytime a stockholder alleges a breach of fiduciary duty by a director, then no matter what would best serve the corporation, the case must proceed to a trial on the merits. Summary judgments, for all practical purposes, would be done away with in such suits. The application of the "business judgment" rule was not intended to be so limited. Justice Brandeis in UnitedCopper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261,263, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917), best states our view:
 "Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders. Courts interfere seldom to control such discretion intra vires the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in dual relation which prevents an unprejudiced exercise of judgment."
When an independent committee composed of disinterested directors decides not to bring an action on behalf of the corporation, the directors are not authorizing or condoning the alleged wrongful acts but are merely saying that given the fact that the events did occur, it is not in the best interest of the corporation to pursue a legal remedy. The plaintiff in the present case asserts that the "outside" directors cannot approve acts that are ultra vires or illegal. We agree with this assertion but disagree with its application to the present case. The case of Genzer v. Cunningham, 498 F. Supp. 682
(E.D.Mich. 1980), states the rule, that we adopt as follows: "[U]pon finding that a special committee of disinterested directors has determined in good faith and after a thorough investigation that it is not in the company's best interests to allow an action to proceed, [the `business judgment' rule] would not allow the courts to interfere with the committee's determination." The following facts were recited by the trial court in its order granting a dismissal and *Page 633 
summary judgment in regard to the committee and its investigation:
 "[A] Special Committee was appointed to investigate the Plaintiff's charges; the Special Committee consisted of two lawyers with unquestioned reputations for integrity — Mr. Massey Bedsole of Mobile and Mr. James Inzer of Gadsden — neither of whom were dependent on the Company for their livelihood; the Special Committee conducted an extensive investigation which included two trips to Montgomery and one to Mobile, on-site inspection of the work in question, interviews of some fifteen (15) witnesses (both Company employees and non-employees) who offered a variety of views on Plaintiff's charges, inspection of all pertinent documentary evidence, and an invitation which was declined by the Plaintiff to appear before the Special Committee; the Special Committee's investigation resulted in a written report of some twenty-four (24) pages which concluded that this litigation did not serve the best interest of the Company; the Special Committee's report was presented only to the `outside' directors of the Company, who were not employed by the Company and were not dependent on the Company for their living; the `outside' directors, all men of substantial and independent means, from towns located throughout the state, included, among others, the Chairman of the First National Bank of Tuscaloosa, the President of Allied Products Corporation, the President of Coca-Cola Bottling Company of Birmingham, the Chairman of First Alabama Bancshares, the President of Protective Life Insurance Company, the Chairman of Alabama Bancorporation and the Chairman of Parisian, Inc.; none of the `outside' directors had any connection whatsoever with the transactions under attack in Plaintiff's Complaint; all employees, officers, `inside' directors and defendants were excused when the `outside' directors considered, discussed, deliberated on, and voted on the Special Committee's Report; and all `outside' directors unanimously adopted the Special Committee's Report, concluding that this litigation should be terminated."
The findings of the Special Committee on each of the matters set out in the complaint were as follows:
 "The Fred Jones Matter
"The first person interviewed on June 18 was former State Senator Fred Jones, at his residence on Dresden Drive. Mr Jones showed us the swimming pool and surrounding area, pointing out the areas involved in the relocation of the service cable, and confirming that he had not been charged by the Company for this work
"Mr. Jones verified that a Power Company primary had been inadvertently cut in two places by the Company's contractor, while ditching the Jones' back yard on or about July 6, 1978, for the relocation of the service cable. In order for the Company to splice the primary, which supplied not only Jones but many other homes, the Jones yard around the swimming pool suffered additional damages. As someone put it, they `really tore the yard up' with the two holes that had to be dug to fix the primary. This was the yard damage that brought about the $640.05 landscaping charge for which the Company was not reimbursed. This charge was not attributable to the relocation of the service cable or the swimming pool excavation Furthermore, we learned that the damaged primary had been previously located underground through Jones' back yard apparently without permission. It should have been laid within the easement therefor at the rear of the Jones premises but it was not. No reasons for the mis-location [sic] could be ascertained. This constituted a continuing trespass by the Company on the Jones property, and would have been more expensive to remove than the landscaping bill
"Mr. Jones said he originally expected to have to pay something for the relocation work. Jones was quick to say, however, that after the yard was torn up so badly, he did not feel he ought to have to pay anything *Page 634 
"Landscaping aside, the circumstances surrounding the initial decision not to charge Jones for relocating his service cable received our close attention. In addition to examining Company records bearing on the matter, and talking to Mr. Jones, the Committee interviewed some twelve other persons during the course of the day on this and the other matters being investigated
"We found that Jones' request for his service line to be relocated to make way for the swimming pool was received by Milton Taff, District Manager, Montgomery, through Clark Richardson, a Power Company representative on Capitol Hill, the contact being between mid June and early July, 1978. It seemed that Jones was about to have a contractor ready to start digging for his swimming pool and the service line had not been moved. As Jones put it, he was in a hurry
"Jones said he had called into the Power Company office a couple of times through regular channels and had received no response; so he mentioned the matter to Clark Richardson on the Hill one day and asked for his assistance. We could find no record of any earlier call from Jones through regular channels There was some indication that Jones had just overlooked the matter of moving the service cable, and found himself about to get in a jam because the swimming pool contractor was ready to start digging. In any event, he definitely had a time problem on his hands
"The fact that the request for the relocation came into the office at the District Manager's level prompted the discussion by Mr. Taff with Division Vice President H.P. Foreman, who made the decision not to charge. Otherwise, if it had come only through regular channels, the Division Vice President would not have been brought into the decision. Other people down the line had the authority to make the decision as to charging the customer. In that event, it is not likely that Mr. Foreman would have known anything about it. While we found instances where the customer had been charged in the past for relocation work, ordinarily there was no charge made for such work required by an installation or improvement resulting in increased load. Such constituted new business. The installation of a swimming pool may not always have been regarded by some individuals in the Company as new business. However, it had come to be so recognized by the Marketing Department, and the initial decision not to charge then Senator Fred Jones for the relocation work could have been appropriately made on that basis. As a matter of fact, the record shows that the installation increased the load at the Jones residence
"Based on our investigation, it is our judgment that the decision not to charge Mr. Jones for the relocation of his service cable was justified. We do not feel such decision violated acceptable and prudent business judgment. We do not believe this constituted concessions or a rebate in rates or in anywise violated any law. Nor was the rendering of the service without charge in this instance a gift or a favor in the legal sense contemplated by any statute alleged by James Otis Roberts to have been violated. Although, as a matter of hindsight, one could find a basis for criticism, on strictly technical grounds, of some aspects of the Jones matter (such as paperwork completed after the fact), the explanation for all of such was entirely understandable, and no wrongdoing on the part of anyone. Specifically, while Fred Jones was a State Senator at the time, based on our investigation we reject the charge that the rendering of the services without charge violated any law
"If the Jones request for service relocation had come in through regular channels, no doubt the decision not to charge would have been made lower down in the chain instead of by the Division Vice President. However, the fact that such decision was made by a higher authority in this instance then was required under Company procedure did not make it either improper or illegal. Neither did the fact that a State Senator was involved. As a matter of voting record, Senator Jones never voted pro-Alabama Power on any measure affecting the Company Furthermore, at the time of the incident here being considered, Mr. Jones *Page 635 
had already made it known he would not be a candidate for re-election. We have reported at length about this matter only because of the serious nature of the charges made
 ". . . . "The Eastdale Mall Matter
"The Roberts shareholders suit charges that the compromise agreement worked out in August, 1976 between the Company and the developers of Eastdale Mall, among other things, resulted in the willful and wrongful dissipation of corporate assets of Alabama Power Company. It is alleged that the cost borne by the Company in the course of providing original service to Eastdale Mall was excessive in the amount of $96,000. This amount according to Roberts would have been paid by the developer if Company policy had been properly applied
"Admittedly, operation Bulletin 425 had been promulgated in 1975 a few months prior to the commencement of the construction of Eastdale Mall. If this bulletin had been strictly applied, the Company would have paid some $57,568. The developers of Eastdale contended that they had computed their construction costs and formulated leases based on the terms of a previous guideline or policy which became effective in 1971. A compromise was worked out, resulting in the Company paying some $153,568 toward the installation. This was $96,000 more than it would have borne if operation Bulletin 425 had been strictly applied
"We feel that this compromise was purely a management decision. Under the circumstances, this Committee believes that the developers of Eastdale Mall could have made a strong case against the Company for damages. The compromise rather obviously avoided a possible lawsuit, or at least a decision by the developers to go less than total electric. The soundness of the business decision is further justified by the fact that the initial combined annual billing for the Eastdale Mall was approximately $400,000 and for the 12 month period prior to March 20, 1979 was $788,978.87. This return against an investment of $96,000 speaks for itself
"Furthermore, our investigation reflected that operation Bulletin 425 was not intended to be strictly applied to the construction of malls. Company policy recognizes that malls are unique in the sense here involved, and in each situation a mutually satisfactory business arrangement for the proration of initial installation costs is contemplated
 "The Alabama Christian College Matter
"The decision to install the six poles without charge is viewed by the Committee as simply a management decision and part of the Company's civic rent. What was done was not controlled by the Company's contribution policy, and was consistent with long time Company policy of permitting free use of equipment to install light poles on Little League fields, helping cities hang Christmas decorations without charge, and installing flag poles at many of the schools throughout the state without charge. It was interesting to note that while District Superintendent, Roberts, himself, authorized free work at other locations including relocation of a power pole at McGinnis School, a school for retarded children in Montgomery, Alabama
 "The Transfer of James Otis Roberts
"The transfer of Mr. Roberts appears to have been purely an administrative personnel matter and was entirely a management decision, and which transfer is the subject matter of the EEOC litigation filed by Roberts and now pending in Federal Court From our investigation, we do not believe discrimination was involved. In any event, here, as in the other matters investigated, it is our judgment that a shareholders derivative suit with respect thereto is not in the best interest of the corporation
 "CONCLUSION
"The Committee expresses appreciation to the many Company officials and employees whose cooperation contributed to the completion of this investigation. The facts and circumstances revealed are sufficient to enable *Page 636 
the Committee to bring to this Board its conclusions and recommendations
"We have not found anything during the course of the investigation which in our opinion reflects upon the integrity, soundness or propriety of any of the decisions or actions of the Company officers and employees. It is our opinion that all of the decisions made and the actions taken were in the judgment of those responsible therefor in the best interest of the Alabama Power Company. Our opinion is that what was done constituted nothing more than the exercise of reasonable management discretion and judgment
"Based on our investigation, it is our opinion that the shareholders derivative suit should not be further prosecuted We do not believe it to be in the corporate best interest. We are confident that no violation of law or statute occurred Neither do we feel that this Company is entitled to recover any monies from any of the officers or employees named as individual defendants in the shareholders derivative suit
"The Committee has carefully considered the matters involved It is its unanimous judgment that the continuation of this litigation is not justified, would be disruptive of the orderly functions and processes of corporate management, and in any event is not in the best interest of the Alabama Power Company If this Board of Directors concurs with the judgment of this Committee, it is recommended that formal action be taken by the Board to such effect, and that the Board instruct its special counsel to take appropriate action in Court seeking to have the suit dismissed."
There would be no purpose served by allowing a shareholder to bring a derivative suit after a thorough and good faith determination that such a suit would not be in the best interest of the corporation. To allow a suit under these circumstances would be to substitute the judgment of the court and the shareholder for that of the board of directors when it is obvious that the directors are best situated to make such a determination
We do not feel that the rule we adopt today will be the death knell of shareholder derivative suits in Alabama. The action of the board and the committee will still be subject to judicial scrutiny as to whether their action was in the best interest of the corporation and whether such determination was made independently and in good faith. Genzer, supra, page 689. If the court finds the action to have been done otherwise, then the case may proceed. The fact that the directors in Maldonado
allegedly received some personal gain out of their action could have been used to show a possible lack of good faith and independence. The present case is clearly distinguishable on this point in that none of the directors is alleged to have received any personal gain from the acts complained of
In recent cases, involving fact situations much more aggravated than the one presented by this case, courts have held the "business judgment" rule could be used to terminate derivative suits absent a showing of fraud or lack of good faith. Abbey v. Control Data Corporation, supra, and Gall vExxon Corporation, supra. Whether our decision today would extend to the facts that were presented in the above cases will have to be determined when such a case comes before this Court We cite these cases merely to illustrate that the extension of the "business judgment" rule we have adopted is certainly not a strained interpretation of the rule when compared to previous decisions of other courts
As for the trial court's finding that the plaintiff was not a "fair and adequate" representative of the stockholders, such a determination rests largely within the discretion of the trial judge. First Alabama Bank of Montgomery v. Martin, 381 So.2d 32
(Ala. 1980). Only when the discretion is abused will such a determination be reversed. The trial court reached its decision based on the following undisputed facts as stated in its judgment:
 "Mr. Roberts is a former employee of the Power Company who resigned on July 21, 1978 when he was transferred to another position; on January 3, 1979, Mr. Roberts *Page 637 
filed a personal suit against the Power Company alleging age discrimination; on the same day, his attorney wrote the Power Company making certain demands which became the predicate for this derivative suit; on January 25, 1979, the same attorney filed this derivative suit in this Court, asserting as one of its grounds age discrimination, which grew out of the same transaction made the basis of James Otis Roberts' federal lawsuit; and this derivative suit is directed at top management — the President and three Vice-Presidents — two of whom were sued by Mr. Roberts in his personal suit for age discrimination in federal court. In the light of these facts, it seems clear that the derivative suit, far from seeking to vindicate the rights of other stockholders, was intended to enhance Plaintiff's position in his personal lawsuit which, if successful, would have reduced the equity of the stockholders whom he was purporting to represent
 "On January 7, 1980, long after these motions were under submission, the Plaintiff amended this derivative action by eliminating the count based on age discrimination. In an accompanying letter, the Plaintiff explained that sometime in the fall a jury had returned a verdict against him on his age discrimination claim in federal Court; and he suggested that this loss would somehow remove his conflict of interest. This Court is not persuaded that this loss diminished or removed the Plaintiff's real or potential conflict of interest. It seems unlikely, to this Court, that Plaintiff's loss in his
personal lawsuit will give him the requisite detachment, required under Rule 23.1, to stand in the shoes of and make decisions for the stockholders whom he has just unsuccessfully sued." (Emphasis in original.)
After consideration of the foregoing conclusions of the trial court, we find there was no abuse of discretion
Accordingly, the action of the trial court in granting Alabama Power Company's motion for summary judgment is affirmed
AFFIRMED
MADDOX, EMBRY and ADAMS, JJ., concur
FAULKNER, J., concurs specially
[1] It is suggested by the appellee that the trial court might have dismissed this action because Roberts was a preferred stockholder and, therefore, lacked standing to bring suit. The trial court did not address that issue in its judgment; consequently, that issue is not before the Court.