Ora E. GAINES, Plaintiff-Appellant,

v.

D. J. HAUGHTON et al.,
Defendants-Appellees.

Lois A. and James FITZPATRICK,
Plaintiffs-Appellants,

v.

D. J. HAUGHTON et al.,
Defendants-Appellees.

Nos. 79–3336, 79–3516.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 3, 1981.

Decided May 18, 1981.

Rehearing and Rehearing En Banc
Denied July 10, 1981.

Carlyle W. Hall, Jr., Los Angeles, Cal., for plaintiff-appellant.

Seth M. Hufstedler, Beardsley, Hufstedler & Kemble, Los Angeles, Cal., for defendants-appellees; W. Scott Burke, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., on brief.

Before ELY and FARRIS, Circuit Judges, and SOLOMON,* District Judge.

ELY, Circuit Judge:

Ora E. Gaines, the plaintiff-appellant herein, appeals from an order of dismissal and summary judgment for defendants (Lockheed Aircraft Corporation and a number of former and present directors and

---

* Honorable Gus J. Solomon, Senior United States District Judge, District of Oregon, sitting by designation.

officers of Lockheed) in a shareholder lawsuit alleging both derivative claims of breach of fiduciary duty/waste of corporate assets and class action claims of federal securities violations. Gaines assigns a variety of errors by the District Court and seeks partial summary judgment and/or remand.

## FACTS

From as early as 1961 to as late as 1975, Lockheed engaged in the practice of hiring "consultants" and "foreign sales agents" and paying them large fees and commissions in connection with foreign sales of Lockheed aircraft and equipment. Approximately $30–38 million was paid directly to foreign governments and officials during this period.[1] Shortly after the existence of these clandestine, "off the books" questionable payments was revealed by Securities and Exchange Commission (SEC) and United States Senate proceedings[2] in July-August 1975, Gaines—an individual Lockheed shareholder—commenced his lawsuit in the United States District Court for the Central District of California.[3] Gaines' complaint, filed on February 24, 1976, asserts two derivative causes of action on behalf of the corporation and two class action counts on behalf of the shareholders.

■ The derivative causes of action—based on California law since Lockheed is a California corporation[4]—allege that the individual defendants[5] breached their fiduci-

---

1. There are no allegations that Lockheed made improper payments to *domestic* officials or that any federal criminal laws were violated by the foreign payments. *See* Special Review Committee Report at 7–15. The Foreign Corrupt Practices Act of 1977, Pub.L.No. 95–213, 91 Stat. 1494, codified at 15 U.S.C. §§ 78m, 78dd–1, 78dd–2, 78ff, was signed into law after the conclusion of the scenario herein. *See generally* Comment, *The Foreign Corrupt Practices Act of 1977: A Solution or a Problem?*, 11 Cal. W. Int'l L.J. 111, 137–39 (1981).

2. *See Hearings on Political Contributions to Foreign Governments Before the Subcomm. on Multinational Corporations of the Senate Comm. on Foreign Relations*, 94th Cong., 1st Sess. (1975).

3. A very similar shareholder suit filed on February 17, 1976 in the Southern District of Texas, *Fitzpatrick v. Haughton*, was consolidated with this action in the Central District of California on April 5, 1976. The District Court's opinion disposed of the two cases jointly. On June 12, 1980, this court ordered the appeals consolidated. Our decision disposes of both appeals, though discussion focuses on Gaines' claims.

4. An independent jurisdictional basis for these pendent state law claims is diversity of citizenship, as Gaines is a citizen of Georgia. 28 U.S.C. §§ 1332(a)(1), (c).

5. Named as individual defendants were: D.J. Haughton, A.C. Kotchian, R.A. Anderson, C. Chappellet, C.S. Gross, W.M. Hawkins, C.L. Johnson, D.M. Cochran, and J.K. Horton. When the complaint in this case was filed, the Lockheed board was composed of fifteen directors. Gaines avers on appeal that seven Lockheed board members (D.J. Haughton, A.C.

Kotchian, L.O. Kitchen, R.A. Anderson, J.K. Horton, D.M. Cochran, and C.S. Gross) either participated in or clearly knew of the improper transactions. These directors, assuming Gaines' allegations are correct, were disqualified from serving as disinterested and independent board members for purposes of the business judgment decision whether to pursue Gaines' derivative lawsuit on behalf of Lockheed. Needless to say, these directors were also interested for purposes of excusing or rendering futile the Fed.R.Civ.P. 23.1 "demand" requirement. Gaines contends further, however, that

> board members who are under the control or influence of the alleged wrongdoers (including current or former officers, employees, members .of outside counsel law firms, and others who have an economic or financial relationship to the alleged controlling wrongdoers) cannot be considered disinterested and independent directors under the business judgment doctrine.

For this reason, Gaines argues, four additional Lockheed directors (J. Cross, C. Chappellet, W.M. Hawkins, and C.L. Johnson), making an 11/15 majority, were disqualified.

We assume, without deciding, that in these circumstances Gaines' duty to "demand" that the board of directors vindicate Lockheed's alleged injury in its own behalf would have been futile. *See* Complaint, ¶ 41. We also assume, without deciding, that a majority of Lockheed's fifteen directors were "interested" for purposes of the business judgment rule. It is uncertain whether allegations of "control or influence" should suffice to divest a corporation's directors of their ability to make collective corporate decisions. *Compare Maldonado v. Flynn*, 597 F.2d 789, 793–94 (2d Cir. 1979) ("disinterest" in rule 10b–5 disclosure context is the lack of any concrete financial stake by a director in

ary duty to the corporation and "wasted" corporate assets by authorizing, employing, and affirmatively concealing corrupt business practices (*i. e.*, the practice of paying large "sales commission," "consulting fees," and outright bribes to foreign purchasers, foreign government officials, and their agents) which resulted in "no use or benefit to Lockheed whatsoever" (Complaint, ¶ 43(a), *see id.* ¶¶ 43(c), (e), 44) and tarnished Lockheed's image and goodwill. *See id.* ¶¶ 17, 30. The class action counts—based on federal securities law—allege that defendants-appellees (hereinafter "appellees") violated the filing and proxy requirements of §§ 13(a) and 14(a) of the Securities Exchange Act of 1934, as amended ("the 1934 Act"), 15 U.S.C. §§ 78m & 78n, by (1) failing to disclose the existence and details of the questionable foreign payments to the shareholders in proxy solicitation materials each year from 1961–74, and (2) by filing materially false and misleading annual and other periodic financial reports on behalf of Lockheed.

Gaines' federal class action claims seek a permanent injunction barring Lockheed from making further improper or undisclosed payments, filing materially false or misleading proxy materials or periodic financial reports, or maintaining any undisclosed accounts. Gaines also seeks a declaration invalidating past elections, removing certain directors, appointing a special master to investigate the payments made, approving new proxy materials, requiring amendment of prior filings, and requiring an accounting of payments made. Gaines does not seek any damages in his § 13(a) or § 14(a) claims.

The *derivative* causes of action seek restitution and money damages for "any and all" disbursements and expenditures in connection with the alleged corrupt business practices and improper foreign payments, including interest, attorneys' fees, and punitive damages.

Apart from the commencement of Gaines' lawsuit, the revelation of Lockheed's foreign payments in July-August 1975 precipitated several other events.[6] On February 2, 1976, the Lockheed board of directors appointed a Special Review Committee[7] (SRC), whose investigation was assisted by the New York law firm Shearman & Sterling and the accounting firm Arthur Anderson & Co. and was directed by the SRC's

the transaction under consideration); *Galef v. Alexander*, 615 F.2d 51, 58–62 (2d Cir. 1980) (intimating that a director is "interested" for purposes of overriding directors' refusal of plaintiffs' Rule 23.1, demand and exercise of business judgment to terminate derivative lawsuit only if he authorized or participated in the alleged wrongdoing); *and Findley v. Garrett*, 109 Cal.App.2d 166, 176–77, 240 P.2d 421, 427 (1952) (for purposes of exercising business judgment, a director is incapacitated, *i. e.*, interested, only when allegations of specific facts are pleaded which show actual participation in or concealment of the alleged misconduct), *with Burt v. Irvine Co.*, 237 Cal.App.2d 828, 47 Cal.Rptr. 392, 414–15 (1965) (suggesting that uninvolved directors' business judgment to dismiss derivative suit will be disregarded on the basis of allegations of "domination and control" by corporate wrongdoers). *But see Lewis v. Anderson*, 615 F.2d 778, 783 (9th Cir. 1979), *cert. denied,* — U.S. —, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980) (applying California law) ("To allow one shareholder to incapacitate an entire board of directors merely by leveling charges against them gives too much leverage to dissident shareholders."). *See generally* Buxbaum *Conflict-of-Interest Statutes and the Need for a Demand on Directors in Derivative Actions,* 68 Calif.L.Rev. 1122 (1980); Comment, *The Demand and Standing Requirements in Stockholder Derivative Actions,* 44 U.Chi.L. Rev. 168, 173–80, 193–96 (1976).

**6.** For a description of the SEC's general response to the disclosure of questionable foreign payments by American corporations, *see* Note, *Disclosure of Payments to Foreign Government Officials Under the Securities Acts,* 89 Harv.L. Rev. 1848, 1850–53 (1976).

**7.** The original members of the SRC were four nonmanagement Lockheed directors: Messrs. D.M. Cochran, J.K. Horton, F.M. Vinson, and R.W. Haack. On April 14, 1976, after Gaines commenced his lawsuit, four independent outside directors joined the Lockheed board and were appointed to the SRC. These directors, who later became the Special Litigation Committee, were: J.P. Downer (executive vice president of Atlantic Richfield Co.), H.I. Flournoy (dean of Center for Public Affairs of the University of Southern California), E.L. Hazard (former chairman of Continental Group, Inc.), and J.W. Newman (former chairman of Dun & Bradstreet Cos.).

counsel, former United States District Judge Arnold Bauman. On April 13, 1976, and in response to an SEC complaint, *see SEC v. Lockheed Aircraft Corp.,* [1975–1976 Transfer Binder] Fed.Sec.L.Rep. ¶ 95,509 (CCH) (D.D.C.1976), Lockheed entered into a consent decree and permanent injunction which enjoined future improper payments, improper accounting methods, and other forms of concealment; required amendment of prior SEC filings; provided for an internal corporate investigation and report procedures to be conducted under SEC supervision; and ordered other remedial actions. On June 23, 1978, Lockheed agreed to a consent order of the Federal Trade Commission containing even more sweeping prohibitions than those contained in the SEC permanent injunction. *See In re Lockheed Corp.,* [1976–79 Transfer Binder] Trade Reg. Rep. (CCH) ¶ 21,454 (FTC Dkt. C–2942, Aug. 17, 1978).

The SRC conducted a fourteen-month investigation, interviewed more than 250 witnesses, and issued a report (dated May 16, 1977) to the Lockheed board, the SEC, and the United States District Court for the District of Columbia on May 26, 1977. The SRC report, which concluded that Lockheed had, with the approval and participation of several senior executives, made $30–38 million in questionable and "off the books" foreign payments, was distributed to all Lockheed shareholders on June 10, 1977. The SRC report contained a "secret" two-volume appendix prepared by Judge Bauman, which the District Court placed under a protective order on June 10, 1977.

On April 20, 1977, the Lockheed board appointed a Special Litigation Committee [8] (SLC), and delegated to it the full power and authority of the board of directors with respect to the then-pending derivative lawsuit.[9] The SLC, composed of four non-defendant outside directors, retained independent outside counsel [10] and, over a period of ten months, considered the factual and legal merit of Gaines' lawsuit. In its March 14, 1978 report, the SLC detailed the factual background of Gaines' lawsuit, enumerated and analyzed a series of factors it deemed definitive of Lockheed's interest in pursuing the suit,[11] and unanimously concluded

---

**8.** *See* note 7 *supra.*

**9.** This delegation was authorized by Article III, § 15 of Lockheed's bylaws and § 311 of the California Corporations Code. Cal.Corp. Code § 311 provides as follows:

The board may, by resolution adopted by a majority of the authorized number of directors, designate one or more committees, each consisting of two or more directors, to serve at the pleasure of the board. The board may designate one or more directors as alternate members of any committee, who may replace any absent member at any meeting of the committee. The appointment of members or alternate members of a committee requires the vote of a majority of the authorized number of directors. Any such committee, to the extent provided in the resolution of the board or in the bylaws, shall have all the authority of the board, except with respect to:

(a) The approval of any action for which this division also require shareholders' approval (Section 153) or approval of the outstanding shares (Section 152).

(b) The filling of vacancies on the board or in any committee.

(c) The fixing of compensation of the directors for serving on the board or on any committee.

(d) The amendment or repeal of bylaws or the adoption of new bylaws.

(e) The amendment or repeal of any resolution of the board which by its express terms is not so amendable or repealable.

(f) A distribution to the shareholders of the corporation (Section 166), except at a rate or in a periodic amount or within a price range determined by the board.

(g) The appointment of other committees of the board or the members thereof.

**10.** The SLC retained the New York law firm Cleary, Gottlieb, Steen & Hamilton in May 1977 and the Los Angeles law firm Beardsley, Hufstedler & Kemble in July 1977. The accounting firm Arthur Anderson & Co. conducted an extensive further investigation for the SLC. *See* Special Litigation Committee Report at 7.

**11.** These factors included the following:

1. whether or not each defendant's conduct has been such as to give rise to a cause of action by Lockheed against him;

2. the legal and practical difficulties of sustaining any possible cause of action;

3. the cost to Lockheed in resources of time and money of pursuing any particular claim;

4. the likelihood that, if successful, Lockheed would realize a significant recovery;

5. the effect that dismissal or pursuit of the claims would have on Lockheed's reputation

that "sound business judgment as to the interests of Lockheed in light of the circumstances and legal considerations here present leads directly and clearly to the conclusion that the claims asserted in the derivative cases should not be pursued against any of the defendants." Special Litigation Committee Report at 41. Consistent with its decision that the pursuit of the derivative litigation was not in the best interests of the corporation or its shareholders, on March 14, 1978, the SLC directed its counsel to seek dismissal of the derivative claims. Shortly thereafter, Lockheed authorized counsel to seek dismissal of the federal class action claims. These motions were filed in the District Court on April 17, 1978.[12]

## THE DISTRICT COURT DECISION

■■■ Judge Whelan's order of summary judgment for appellees was entered on April 20, 1979. The District Court opinion, which contains findings of fact [13] and conclusions of law, is entitled "Memorandum of Grounds Supporting Decision Granting Summary Judgment" [hereinafter "District Court Memorandum"]. Judge Whelan granted summary judgment for appellees on the derivative state law claims because a Special Litigation Committee of disinterested directors, appointed by the full board, had unanimously determined in the exercise of its lawfully delegated [14] independent

business judgment that pursuing legal claims against the individual appellees would not be in the best interests of the corporation.

The District Court determined that the decision of the SLC to terminate the derivative lawsuit

> was made in good faith after consideration of relevant factors. There was no fraud, collusion, or other conduct of a breach of trust nature on the part of any member of the Committee.
>
> The Committee's business judgment is not grossly unsound. It cannot be concluded that it did not represent the Committee's honest and independent judgment. . . .
>
> The Court may not substitute its judgment for the good faith business judgment of the Committee which is charged with the conduct of the business of the corporation in this matter.
>
> There are no genuine issues of material fact to be tried herein with regard to the Committee's exercise of its business judgment.

District Court Memorandum at 7. Judge Whelan based his holding on this issue on California law. *See Findley v. Garrett,* 109 Cal.App.2d 166, 174, 240 P.2d 421, 426 (1952). His ruling presaged this Court's decision in *Lewis v. Anderson,* 615 F.2d 778 (9th Cir. 1979), *cert. denied,* —— U.S. ——,

and standing in the business community and elsewhere;

 6. the effect the dismissal or pursuit of the claims would have on the morale and adherence to current business practices of Lockheed's employees;

 7. the extent to which, if at all, continued litigation would result in disclosures of facts and suppositions harmful to Lockheed and its stockholders as well as to the national interest; and

 8. the extent to which, if at all, Lockheed would be damaged by protracted and embittered litigation with its officers past and present.

Special Litigation Committee Report at 9–10.

**12.** The motions were formally made and argued on July 17, 1978. On August 16, 1978, while these motions were pending, Gaines moved for partial summary judgment on § 14(a) claims relating to the proxy materials circulated for

the 1977 and 1978 director elections, contending that the solicitations were materially misleading as a matter of law. Upon Lockheed's motion, Gaines' motions were put "off calendar." As will be discussed *infra,* we need not address the merits of this issue.

**13.** While "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under [Fed.R.Civ.P. 56]," Fed.R.Civ.P. 52(a), on the theory that only questions of law—the existence *vel non* of a genuine issue of material fact—are presented, such findings are, nevertheless, permissible and often quite helpful for appellate review. *See* 6 Moore's Federal Practice ¶ 56.02[11] (2d ed. 1976). Such findings are, however, freely reviewable as questions of law. *See Heiniger v. City of Phoenix,* 625 F.2d 842, 843–44 (9th Cir. 1980).

**14.** *See* note 9 *supra.*

101 S.Ct. 206, 66 L.Ed.2d 89 (1980), which is discussed *infra.*

The District Court also dismissed Gaines' federal securities claims pursuant to Fed.R. Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Because Gaines did not allege in his complaint that he purchased or sold Lockheed stock in reliance on Lockheed's allegedly false and misleading proxy statements and did not allege that he actually granted a proxy based on the allegedly false and misleading proxy solicitation materials, the District Court held that Gaines did not have standing to assert a nonderivative § 14(a) cause of action. "To maintain an [individual, nonderivative] action under Section 14(a), plaintiffs must allege that they granted a proxy based on the alleged false and misleading proxy solicitations .... *Klaus v. Hi-Shear Corp.*, 528 F.2d 225 (9th Cir. 1975)." District Court Memorandum at 8–9.

■ Moreover, because Gaines had not alleged any direct relationship between the proxy materials distributed and the improper foreign payments, Judge Whelan dismissed Gaines' § 14(a) claim for lack of "casual connection" between the alleged violation and the alleged injury. Alternatively, the District Court dismissed the § 14(a) claim because Gaines sought only declaratory and injunctive relief and Lockheed had already entered into a consent decree and permanent injunction with the SEC, which enjoined future foreign payments, corrupt and improper business practices, and other

conduct that served as the gravamen of Gaines' federal claims. The consent decree also required Lockheed to implement certain reforms and to amend and correct its prior SEC filings. Judge Whelan stated:

> For a grant of injunctive or declaratory relief, the plaintiffs must show that irreparable harm will occur in the absence of such relief. Injunctive relief is not proper where a prior injunction restraining the same conduct has been obtained and is still in force ....
>
> [I]njunctive and declaratory relief is improper as a matter of law under these facts.

District Court Memorandum at 9.[15]

## STANDARD OF REVIEW

■ The test to be applied in reviewing the grant or denial of a summary judgment motion is that summary judgment is proper only when there is no genuine issue of any material fact or when viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law. *Smith v. Gross*, 604 F.2d 639, 641 (9th Cir. 1979); *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1254 (9th Cir. 1976) (per curiam). Phrased differently, an appellate court reviewing a summary judgment "need decide only whether any genuine issue of material fact remains for trial and whether the substantive law was correctly applied." *Inland Cities Express, Inc. v. Diamond National Corp.*, 524 F.2d 753,

---

**15.** The District Court also dismissed the § 13(a) claim on the ground that § 18(a) of the 1934 Act, 15 U.S.C. § 78r, the exclusive remedy for violations of § 13(a), requires that "plaintiffs allege either a purchase or sale in reliance on the alleged false and misleading statements in order to maintain a cause of action based on ... Section 13(a)." District Court Memorandum at 8. *Accord, Cramer v. GTE Corp.*, 582 F.2d 259, 269–70 (3d Cir. 1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979). Gaines does not challenge on appeal the Rule 12(b)(6) dismissal of the § 13(a) claim.

As a subsidiary issue in this case, on June 10, 1977, the District Court granted a protective order pursuant to Fed.R.Civ.P. 26(c), which restricts public dissemination of an appendix to

the SRC report. The appendix allegedly contains confidential pricing data and sensitive information regarding the details of the foreign bribes and payoffs. Gaines contends that the protective order, which permits Gaines to review the appendix but forbids xerox or mechanical reproduction, is overbroad and constitutes an abuse of discretion. The trial court, however, normally possesses broad discretion in regulating discovery. *See ISI Corp. v. United States*, 503 F.2d 558, 559 (9th Cir. 1974) (per curiam); 4 Moore's Federal Practice ¶ 26.75 (2d ed. 1979 & Supp. 1980). Our disposition of this appeal relieves us of the need to determine what modifications, if any, would be required of the protective order.

754 (9th Cir. 1975). *See Dressler v. MV Sandpiper*, 331 F.2d 130, 133–34 (2d Cir. 1964) (vague and conclusory allegations by party moved against will not prevent a court from screening out "sham issues of fact" and determining whether "one side has no real support for its version of the facts").

■ As with motions for summary judgment, in reviewing a motion to dismiss, the appellate court should construe the allegations of the complaint favorably to the pleader. *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979).

■ Ordinarily, an appellate court can freely review questions of law. *Miller v. United States*, 587 F.2d 991, 994 (9th Cir. 1978). However, when a federal court is in the position of interpreting state law with no definitive guidance from the state's highest court, *see Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967), we accord "substantial deference" to the district judge's interpretation or construction of the law of the state in which he sits. *Kabatoff v. Safeco Ins. Co. of America*, 627 F.2d 207, 209 (9th Cir. 1980); *Associated General Contractors v. San Francisco Unified School District*, 616 F.2d 1381, 1384 (9th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980); *Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979), *cert. denied*, —— U.S. ——, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980); *Mesa Oil Co. v. Business Men's Assurance Co. of America*, 476 F.2d 491, 494 (9th Cir.), *cert. denied*, 414 U.S. 1003, 94 S.Ct. 358, 38 L.Ed.2d 239 (1973). The District Court's construction of state law will be accepted on review unless it is "clearly wrong" or "clearly erroneous." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980); *Owens v. White*, 380 F.2d 310, 315 (9th Cir. 1967).

### ISSUES ON APPEAL

On appeal, Gaines challenges the order of summary judgment for appellees on the derivative state law claims and the dismissal of the § 14(a) cause of action for failure to state a claim upon which relief can be granted. Specifically, the issues in this appeal are as follows:

1. Whether the District Court correctly applied the "business judgment rule" to the SLC's decision to terminate Gaines' derivative state law claims alleging breach of fiduciary duties by the individual appellees and, if so, whether triable issues of fact exist regarding the special investigative and litigation committees' compliance with the rule.

2. Whether the District Court erred in dismissing the § 14(a) claim on the basis of its holdings that (a) only a shareholder who has himself given a proxy to management has legal "standing" in a nonderivative shareholder action under § 14(a); and (b) "causal nexus" between proxy materials and shareholder injury is lacking as a matter of law when an equitable § 14(a) claim is premised on failure to disclose director misconduct and/or mismanagement (other than self-dealing) in proxy solicitation materials for director elections.[16]

For the reasons discussed herein, we affirm the District Court's invocation of the business judgment rule and dismissal of Gaines' § 14(a) claim.

### DISCUSSION

I. The Business Judgment Rule and Corporate Decisions to Terminate Derivative Litigation

In *Lewis v. Anderson*, 615 F.2d 778 (9th Cir. 1979), *cert. denied*, —— U.S. ——, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980), this court decided that, as a matter of California law, a corporation's board of directors may delegate to a disinterested "special litigation

---

**16.** Our resolution of the § 14(a) issues permits us to reserve the decision on whether, and to what extent, an equitable § 14(a) claim becomes "moot" when the substance of a plaintiff's requested injunctive or declaratory relief is provided by voluntary remedial measures or other modes of adjudication. *See Browning Debenture Holders' Committee v. DASA Corp.*, 524 F.2d 811, 814–15 (2d Cir. 1975).

committee" the business judgment authority to dismiss a shareholder derivative lawsuit brought on behalf of the corporation against some of the directors. While *Lewis* is not identical to the instant case—*Lewis* determined only the legal *authority* of the delegation and exercise of the "business judgment rule"; did not pass on the factual determination of whether the committee acted in good faith; and involved derivative *federal* securities claims—it lends strong support to the District Court's holding on this issue.

Drawing on analogous decisions by intermediate appellate courts in California—for the California Supreme Court had not (and still has not) faced the precise issue *sub judice*—this court in *Lewis* amplified the general common law "business judgment rule" in two important respects.[17] First, *Lewis* held that a board of directors' general management responsibility and discretion—including the decision whether to pursue a cause of action—may be delegated to a committee of directors.[18] The committee's *good faith* decision that dismissing a derivative action would be in the best interests of the corporation, even if that decision is negligent, bars any further legal action by the shareholder. 615 F.2d at 780, 783–84. The second, and related, holding of *Lewis* is that even when "a majority of the board is charged with wrongdoing in the very action sought to be dismissed," *id.* at 782, they may appoint a committee of disinterested directors "to make an independent determination of the merits of the [derivative] action." *Id.* The application of the business judgment rule to boards of directors with "interested" majorities is not improper because "the directors who are accused of wrongdoing have not decided to dismiss the case," *id.*, a committee of disinterested directors has. *See Gall v. Exxon Corp.*, 418 F.Supp. 508, 517 (S.D.N.Y.1976).[19]

We noted in *Lewis* that the Eighth Circuit and the New York Court of Appeals have similarly extended the business judgment rule. *See Abbey v. Control Data Corp.*, 603 F.2d 724, 727–30 (8th Cir. 1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980) (applying Delaware law); *Auerbach v. Bennett*, 47 N.Y.2d 619, 629–36, 419 N.Y.S.2d 920, 926–30, 393 N.E.2d 994 (1979) (applying New York law). "*Auerbach* and *Abbey* reflect a clear trend in corporate law, and we are confident that a California court would follow this trend." *Lewis*, 615 F.2d at 783. The role of a court in this situation is limited to determining the disinterested independence of the committee members and the appropriateness and sufficiency of the investigative procedures chosen and pursued by the committee. *Id.*

Gaines urges this court to distinguish or limit our holding in *Lewis*, and even to overrule it outright. We decline this invitation to retreat from *Lewis*, for Gaines has offered no persuasive authorities suggesting that this court's reading of California

---

17. For a discussion of corporate directors' business judgment authority to, *inter alia*, terminate derivative litigation, *see Burks v. Lasker*, 441 U.S. 471, 478, 480, 485, 99 S.Ct. 1831, 1837, 1838, 1840, 60 L.Ed.2d 404 (1979), *rev'g* 567 F.2d 1208 (2d Cir. 1978); *United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263–64, 37 S.Ct. 509, 510–11, 61 L.Ed. 1119 (1917) (Brandeis, J.); *Corbus v. Alaska Treadwell Gold Mining Co.*, 187 U.S. 455, 463, 23 S.Ct. 157, 160, 47 L.Ed. 256 (1903); *Galef v. Alexander*, 615 F.2d 51, 57–62 (2d Cir. 1980); *Genzer v. Cunningham*, 498 F.Supp. 682, 686–89 (E.D.Mich.1980); *Maldonado v. Flynn*, 485 F.Supp. 274 (S.D.N.Y.1980); *Abbey v. Control Data Corp.*, 460 F.Supp. 1242, 1243–46 (D.Minn.1978), *aff'd*, 603 F.2d 724 (8th Cir. 1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980); *Gall v. Exxon*

*Corp.*, 418 F.Supp. 508, 514–17 (S.D.N.Y.1976); *Findley v. Garrett*, 109 Cal.App.2d 166, 174, 240 P.2d 421, 426 (1952); *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979); 3A W. Fletcher, Cyclopedia of the Law of Private Corporations § 1039, at 37–38 (perm. ed. 1975).

18. *See* note 9 *supra*.

19. Allegations of an "interested" majority may, however, excuse a derivative plaintiff's failure to make the preliminary "demand" on the board of directors required by Fed.R.Civ.P. 23.-1. *See Cramer v. GTE Corp.*, 582 F.2d 259, 276–77 (3d Cir. 1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979); note 5 *supra*.

law is no longer tenable. In fact, the developing trend in corporate law we discerned in *Lewis* has become unmistakably clear. *See, e. g., Genzer v. Cunningham*, 498 F.Supp. 682 (E.D.Mich.1980) (applying Michigan law). In addition to *Abbey* and *Auerbach*, many well-reasoned district court decisions have adopted the position that a board of directors may lawfully delegate to a disinterested minority committee the business judgment authority to terminate shareholder derivative litigation because it is either not meritorious or not in the best interests of the corporation. *See Maldonado v. Flynn*, 485 F.Supp. 274 (S.D. N.Y.1980) (on remand) (applying Delaware law); *Rosengarten v. ITT Corp.*, 466 F.Supp. 817, 822–24 (S.D.N.Y.1979); *Gall v. Exxon Corp.*, 418 F.Supp. 508, 514–15 (S.D. N.Y.1976) (applying New Jersey law). The contrary holding of the Delaware Chancery Court, an inferior state court, does not counter this trend or impugn our interpretation of California law. *Maldonado v. Flynn*, 413 A.2d 1251 (Del.Ch.1980). *Cf. Maher v. Zapata Corp.*, 490 F.Supp. 348 (S.D.Tex.1980) (following the Delaware Chancery Court's interpretation of Delaware law); *Abella v. Universal Leaf Tobacco Co.*, 495 F.Supp. 713, 717–18 (E.D.Va. 1980) (applying Virginia law).

▮▮▮ Therefore, we hold that *Lewis v. Anderson* controls in this case. The Special Litigation Committee's decision to terminate Gaines' derivative state law cause of action is, if made in good faith by a disinterested committee of directors, dispositive of Gaines' state law claims. The District Court's prescient anticipation of the *Lewis* interpretation is, in addition, entitled to "substantial deference" and must be affirmed unless "clearly erroneous."

Gaines contends, however, that various factors require remand to the District Court for further findings of fact on the appropriateness and sufficiency of the investigative procedures chosen and pursued by the SLC. Specifically, Gaines argues that Lockheed's

delay in establishing the SLC until a year after this suit was commenced is attributable to shopping around for a "friendly" committee. Gaines also alleges that the participation of two "deeply involved" directors in the formation and investigation of the SRC sufficiently tainted the investigative structure and procedures by the later SLC to preclude summary judgment on this issue. Gaines also asserts that the District Court applied an erroneous legal standard in determining the propriety of the SLC's exercise of business judgment.

▮▮▮ While we are mindful of the need to scrutinize carefully the mechanism by which directors delegate to a minority committee the business judgment authority to terminate derivative litigation,[20] particularly when the lawsuit is directed against some or a majority of the directors, we find that Gaines has not raised a triable issue of fact on this issue. The record establishes beyond question that the SLC was composed of independent outside directors whose investigation and recommendations were not tainted by the attenuated involvement of "interested" directors in the formation and preliminary investigation of the SRC. The record also establishes beyond question that the SLC's investigatory procedures were adequate. *See generally Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 543–44 (9th Cir. 1975). Moreover, we hold that the legal standard employed by the District Court in reviewing the SLC's decision to terminate the litigation comports with this court's statement in *Lewis* that even a negligent decision to dismiss an action is legally dispositive, so long as it is made in good faith. *See* 615 F.2d at 783–84. Accordingly, we conclude that remand is unnecessary. The District Court's order of summary judgment for appellees on this issue is affirmed.

## II. The Dismissal of the § 14(a) Claim

Gaines contends that the District Court's Rule 12(b)(6) dismissal of his § 14(a) claim

---

**20.** *See* Estes, *Corporate Governance in the Courts*, 58 Harv.Bus.Rev. 50, 52–60 (July-August 1980).

was erroneous because his complaint adequately states a cause of action for equitable relief under § 14(a) of the 1934 Act. Gaines challenges both of the District Court's alternative bases for dismissal— that Gaines lacked "standing" to bring a nonderivative action because he himself had not granted a proxy in reliance on the allegedly misleading solicitation materials and that Gaines' complaint failed to allege the requisite "transactional causation" or "causal nexus." Resolution of these issues requires a brief overview of the § 14(a) cause of action.

Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, *in contravention of such rules and regulations as the Commission may prescribe* as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect to any security (other than an exempted security) registered pursuant to section 78*l* of this title.

(Emphasis added.) The pertinent SEC regulation, 17 C.F.R. § 240.14a–9 (1980), provides:

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

(b) The fact that a proxy statement, form of proxy or other soliciting material

has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made.

Note: The following are some examples of what, depending upon particular facts and circumstances, may be misleading within the meaning of this section.

(a) Predictions as to specific future market values.

(b) Material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation.

(c) Failure to so identify a proxy statement, form of proxy and other soliciting material as to clearly distinguish it from the soliciting material of any other person or persons soliciting for the same meeting or subject matter.

(d) Claims made prior to a meeting regarding the results of a solicitation.

■ "The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). The Supreme Court has recognized an implied private cause of action under that section in favor of stockholders and investors who have been injured as a result of false or misleading proxy solicitations. *Id.* at 430–31, 84 S.Ct. at 1558–59. *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 377, 90 S.Ct. 616, 618, 24 L.Ed.2d 593 (1970).

## A. *Standing*

Gaines, who did not grant a proxy in reliance on the contested solicitations, asserts his § 14(a) claim in a direct, not derivative, action seeking only equitable relief.

In *Klaus v. Hi-Shear Corp.*, 528 F.2d 225 (9th Cir. 1975), this court recognized that interference with the processes of corporate democracy results in direct harm to the corporation and to shareholders who were actually deceived. "The harm to be averted is only indirectly that to the individual shareholder." *Id.* at 232. *Accord, J.I. Case Co. v. Borak*, 377 U.S. at 432, 84 S.Ct. at 1559. This court stated in *Klaus v. Hi-Shear*:

> Although a demonstration that proxies were obtained by materially misleading solicitation establishes a violation of section 14(a), the relief available to a plaintiff who did not himself grant a proxy depends on equitable considerations based on "the best interest of the shareholders as a whole." *Mills*, 396 U.S. at 388, 90 S.Ct. at 623.
>
> *Klaus did not himself grant a proxy. He is able to assert a section 14(a) violation only derivatively on behalf of Hi-Shear.* "[N]othing in the statutory policy 'requires the court to unscramble a corporate transaction merely because a violation occurred.'" *Mills*, 396 U.S. at 386, 90 S.Ct. at 622.

528 F.2d at 232 (emphasis added). *Accord, Jacobs v. Airlift International, Inc.*, 440 F.Supp. 540, 542 (S.D.Fla.1977). *See Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 32–33, 41–42, 97 S.Ct. 926, 944–945, 949–950, 51 L.Ed.2d 124 (1977) (defeated tender offeror has no standing to sue in an implied cause of action under § 14(e)); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 735–55, 95 S.Ct. 1917, 1925–35, 44 L.Ed.2d 539 (1975) (limiting standing in rule 10b–5 actions to purchasers or sellers of securities); *Mount Clemens Industries, Inc. v. Bell*, 464 F.2d 339, 341–43 (9th Cir. 1972) (same). *See also Lewis v. McGraw*, 619 F.2d 192, 195 (2d Cir.) (per curiam), *cert. denied,* —— U.S. ——, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980) (shareholders of target company cannot state cause of action for deception under § 14(e) if the failed tender offer fails to become effective).

 Gaines argues that the language from *Klaus v. Hi-Shear* quoted above is dicta, but cites no authority from this Circuit to refute the "standing" rule. We hold that the policies of § 14(a) and established doctrine in analogous securities contexts support the *Klaus v. Hi-Shear* position: shareholders who do not rely on allegedly misleading or deceptive proxy solicitations lack standing to assert direct (as opposed to derivative) equitable actions under § 14(a). Therefore, the District Court's dismissal of Gaines' § 14(a) claim for lack of standing is affirmed. We do not, however, rest our decision solely on this rationale. Even had Gaines granted a proxy to Lockheed's management on the basis of the allegedly defective proxy solicitations, his § 14(a) count would still have been properly dismissed for failure to state a claim. The causation and materiality elements of a § 14(a) cause of action are discussed next.

### B. Transactional Causation and Materiality

Gaines' § 14(a) claim is ultimately premised on appellees' failure to disclose "corrupt and improper foreign payments" and related corporate misconduct to the Lockheed shareholders in the proxy solicitation materials for director elections each year from 1961 to 1975. The real issue in this appeal is whether, and in what circumstances, management's failure to disclose particular conduct to the shareholders states a § 14(a) cause of action.

The precise roles of "materiality," "causation-in-fact," and "proximate cause" in federal securities litigation are often unclear. *See, e. g., Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 50–53, 97 S.Ct. 926, 953–955, 51 L.Ed.2d 124 (1977) (Blackmun, J., concurring); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 444, 448–49, 96 S.Ct. 2126, 2130, 2131–32, 48 L.Ed.2d 757 (1976); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472–73, 31 L.Ed.2d 741 (1972); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 381–85, 90 S.Ct. 616, 620–22, 24 L.Ed.2d 593 (1970); *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716–23 (2d Cir.) (Meskill, J., dissenting), *cert. denied,* —— U.S. ——, 101 S.Ct. 566,

66 L.Ed.2d 469 (1980); *Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650, 653–55 (2d Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600 (1980); *Abbey v. Control Data Corp.*, 603 F.2d 724, 731–32 (8th Cir. 1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980); *Maldonado v. Flynn*, 597 F.2d 789, 795–98 (2d Cir. 1979).

■■■■ Granted that causation is sometimes presumed when the alleged nondisclosure concealed "material" information,[21] *see Mills v. Electric Auto-Lite Co.*, 396 U.S. at 385, 90 S.Ct. at 622 ("Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the [corporate] transaction."), this rationale—the equation of causation to materiality—is logically limited to situations in which shareholder approval was sought (and fraudulently secured) for a transaction requiring such approval, typically so-called "fundamental corporate changes."[22]

■■■ In *Mills*, for instance, the Supreme Court made clear that § 14(a) was intended to ensure that proxies would be solicited with " 'explanation to the stockholder of the real nature of the questions *for which authority to cast his vote is sought*,' " 396 U.S. at 381, 90 S.Ct. at 620 (emphasis added), quoting H.R.Rep.No.1383, 73d Cong., 2d Sess., 14 (1934); S.Rep.No.792, 73d Cong., 2d Sess., 12 (1934). The purpose of § 14(a) was clearly to prohibit management from deceptively securing stockholder approval for transactions requiring such approval. *See* 396 U.S. at 384–85, 90 S.Ct. at 621–22.

■■■ Thus, for *damages* claims relating to the directors' failure to disclose misconduct and/or mismanagement (other than self-dealing or fraud against the corporation), there is no "causal nexus" or "transactional causation," without regard to the issue of materiality, so long as the underlying transaction did not require shareholder approval.[23] The directors' failure to disclose the questionable foreign payments (or other alleged misconduct) is not the legal cause of the pecuniary loss to the corporation, if any. As Judge Henley stated for the Eighth Circuit in *Abbey* :

> Any injury to CDC shareholders from the corporation's illegal foreign payments stems directly from the corporate waste and mismanagement involved in authorizing those payments and not from allegedly misleading proxy solicitations dealing

**21.** An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). *See generally Zweig v. Hearst Corp.*, 594 F.2d 1261, 1271–72 (9th Cir. 1979) (Ely, J., dissenting) (role of causation and materiality in rule 10b–5 context).

**22.** *See* Carney, *Fundamental Corporate Changes, Minority Shareholders, and Business Purposes*, American Bar Foundation Research Journal 69 (Winter 1980).

**23.** The cases reject § 14(a) liability for this type of nondisclosure on both "causation" and "materiality" grounds, but we believe the "causal nexus" rationale is, in this situation, the least confusing approach. *Compare, e. g., Maldona-*

*do v. Flynn*, 597 F.2d at 796 ("The prevailing definition of a 'material fact' under Rule 14a–9 presupposes that the rule applies only when shareholders are asked to vote.... Since Zapata's management did not ask shareholders to approve the modification of the stock option plan, § 14(a) is inapplicable.") *and Bertoglio v. Texas International Co.*, 488 F.Supp. 630, 650 (D.Del.1980) ("[A] broad view of materiality [under § 14(a)] in the context of election of directors would render meaningless the requirement that the misrepresented or omitted fact relate to the purpose for which proxies were solicited."), *with Abbey v. Control Data Corp.*, 603 F.2d at 732 ("Several courts have refused to find a federal remedy under § 14(a) for secret, illegal corporate payments. They have required 'transactional causation' as an essential element of a § 14(a) cause of action: the harm to plaintiff-shareholders must have resulted from the corporate transactions which were authorized as a result of the false or misleading proxy solicitations.").

with unrelated corporate business matters. Consequently, we determine that Abbey's § 14(a)'claim is . . . at best marginally related to the federal policies underlying that section.

603 F.2d at 732.

In *In re Tenneco Securities Litigation*, 449 F.Supp. 528 (S.D.Tex.1978), the district court employed similar reasoning in dismissing a § 14(a) claim predicated on the nondisclosure of questionable foreign payments:

The harm to the plaintiffs must have resulted from the corporate transaction they authorized as a result of the false or misleading proxy solicitation. This "transactional causation" is an essential element of a [§] 14(a) action. . . .

In the instant case, the only "corporate transaction" authorized by the shareholders was the election of directors. The [§] 14(a) violation alleged by the plaintiffs is the failure of the director-candidates to include in their proxy solicitation that they had made the allegedly illegal payments. . . .

In order to recover damages under [§] 14(a) the proxy violation must have caused the economic harm alleged. The economic loss alleged here is the amount of corporate funds allegedly expended for the payments. . . . Such acts of corporate waste and breach of fiduciary duty form the bases of state claims and do not state a claim under the federal securities laws.

*Id.* at 531 (citations omitted). We conclude that the "causal nexus" or "transactional causation" formulation is the preferable mode of analysis for § 14(a) causes of action pertaining to corporate wrongdoing that did not itself require shareholder approval.

The "transactional causation" approach, which we adopt, requires that the District Court's dismissal of Gaines' equitable § 14(a) claim—to the extent that his claim or requested relief relates to the payments themselves—be affirmed. *See Rosengarten v. ITT Corp.*, 466 F.Supp. 817, 827–28 (S.D.N.Y.1979); *Herman v. Beretta*,

[1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,574 (S.D.N.Y.1978); *Limmer v. GTE Corp.*, [1977–78 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 96,111 (S.D.N.Y.1977); *Lewis v. Elam*, [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,013 (S.D.N.Y. 1977); *Levy v. Johnson*, [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,899 (S.D. N.Y.1977). *See also Epic Enterprises, Inc. v. Brothers*, 395 F.Supp. 773, 776–77 (N.D. Okla.1975).

For equitable and declaratory relief claims relating to the *election of directors*, alleged to have been facilitated by the nondisclosure of the underlying misconduct, the causation approach presents problems; as the Second Circuit noted in *Weisberg v. Coastal States Gas Corp.* :

In [§ 14(a) suits for damages predicated on the directors' subsequent failure to disclose corporate misconduct to the shareholders in proxy solicitations], the plaintiff sought damages because of allegedly improper payments, which did not require shareholder approval. The causal link between the proxy solicitation for the election of directors and the injury complained of—the improper payments—was attenuated at best. In the instant case, however, the challenged "transaction" is the election of the directors, and we have no doubt that the "proxy solicitation itself . . . was an essential link in the accomplishment" of that transaction, within the meaning of *Mills*.

609 F.2d at 654.

We agree with the *Weisberg* court that when the plaintiff-shareholder attacks only the election itself, instead of seeking money damages or other relief for the underlying misconduct, the proper analysis shifts from causation to materiality. We draw a sharp distinction, however, between allegations of director misconduct involving breach of trust or self-dealing—the nondisclosure of which is presumptively material—and allegations of simple breach of fiduciary duty/waste of corporate assets—the nondisclosure of which is never material

for § 14(a) .purposes.[24] *See Bertoglio v. Texas International Co.*, 488 F.Supp. 630, 650 (D.Del.1980); *Lewis v. Valley*, 476 F.Supp. 62, 65–66 (S.D.N.Y.1979) (plaintiff's § 14(a) claim based on nondisclosure of questionable foreign payments in proxy solicitations ordered dismissed because, without element of self-dealing, the undisclosed information was not material); *Amalgamated Clothing and Textile Workers Union v. J.P. Stevens & Co.*, 475 F.Supp. 328, 330–32 (S.D.N.Y.1979) (plaintiff's § 14(a) claim premised on nondisclosure in proxy solicitations of directors' asserted policy to thwart the federal labor laws ordered dismissed because, lacking self-dealing, such information is not material).

The Second Circuit in *Weisberg* discussed this distinction without resolving it. *See* 609 F.2d at 654–55. To the extent that *Weisberg* alters the self-dealing/simple mismanagement dichotomy explicitly enunciated in *Maldonado v. Flynn*,[25] *Abbey v. Con-*

24. *Accord,* Comment, *Disclosure of Regulatory Violations Under the Federal Securities Laws: Establishing the Limits of Materiality,* 30 Am.U.L.Rev. 225 (1980) (concluding that the "economic materiality" standard, based on whether information would be significant to a reasonable investor concerned strictly with the financial or economic performance of the corporation, best serves the objective of the federal securities laws—investor protection). "The central purpose of the disclosure requirements of the securities acts is to protect buyers and sellers of securities from fraud and to assure that security prices accurately reflect the earning power of the issuer." Note, *supra* note 6, at 1854 (footnotes omitted). "Traditionally it has been supposed that the reasonable investor is only concerned with the return on his investment—that he is only interested in *financially* significant information." *Id.* at 1855 (emphasis in original; footnote omitted). *See id.* at 1856–70; Weiss, *Disclosure and Corporate Accountability,* 34 Bus.Law. 575, 577, 598, 602 (1979) (the objective of business corporations is to maximize the economic return received by their shareholders; data about a corporation's questionable payments is not clearly significant in any economic sense).

There are clearly instances of illegal conduct by director-nominees, unrelated to self-dealing, *cf.* notes 25–28 *infra* & accompanying text, which would have to be disclosed, especially if they involved criminal convictions. *See, e. g.,* Item 3(f) of Regulation S–K, 17 C.F.R. § 229.20; Item 6(a) of Schedule 14A, 17 C.F.R. § 240.14a–101. Our holding is limited to existing directors' duty under § 14(a) to disclose non-criminal conduct in proxy solicitations for their re-election. To paraphrase Judge Conner's statement in *Limmer v. GTE Corp.* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,111 (S.D.N.Y.1977), at 92,003, this court declines to endorse "the notion that every election of corporate directors, if unattended by proxy statement confessionals of mismanagement past and contemplated, carries with it the seeds of an action for [injunctive or declaratory relief] premised on Section 14(a)."

25. Appellant's claim that the proxy statements used to solicit votes for the election of Zapata directors in 1975, 1976 and 1977 were false and misleading in violation of § 14(a) and Rule 14a–9 thereunder, because of their non-disclosure of the true circumstances surrounding the 1974 amendments to the stock option plan, stands on an entirely different footing. *This claim does not present merely another attempt to use § 14(a) and Rule 14a–9 as an avenue for access to the federal courts in order to redress alleged mismanagement or breach of fiduciary duty on the part of corporate executives.* Efforts to dress up claims of the latter type in a § 14(a) suit of clothes have consistently been rejected, including allegations of failure to disclose a disputed legal theory regarding the legality of transactions approved by the board, failure to disclose an alleged ulterior motive for a fully described corporate action, or failure to disclose lack of skill or judgment in approving a transaction intended for the corporation's benefit. Here, in contrast, the alleged misleading statements and non-disclosures involve matters of direct and deep concern to shareholders in the exercise of their right to vote, which the Exchange Act expects to be fully disclosed in proxy solicitations for election of officers and directors. Indeed, the compensation of directors and key officers and transactions between them and their corporation are matters explicitly covered by SEC disclosure regulations. See Schedule 14A, Items, 7, 9–11, 17 C.F.R. § 240.14a–101. *Since self-dealing presents opportunities for abuse of a corporate position of trust, the circumstances surrounding corporate transactions in which directors have a personal interest are directly relevant to a determination of whether they are qualified to exercise stewardship of the company.* For this reason Rule 14a–9 specifically sets out minimum standards for disclosure and, going beyond the Rule, it has been recognized that shareholders are entitled to truthful presentation of factual information "impugning the honesty, loyalty or competency of directors" in their dealings with the corporation to which they owe a fiduciary duty. 597 F.2d at 796 (emphasis added; citations and footnote omitted).

*trol Data Corp.,*[26] and *Galef v. Alexander,* 615 F.2d 51, 65 (2d Cir. 1980),[27] we decline to follow it. The distinction between "mere" bribes and bribes coupled with kickbacks to the directors makes a great deal of sense, indeed, is fundamental to a meaningful concept of materiality under § 14(a) and the preservation of state corporate law.[28] *Cf. Weisberg,* 609 F.2d at 654–55 (pretermitting the issue and concluding that "[b]ecause plaintiff's allegations of a cover-up of massive bribes *and of kickbacks to the directors, if true, would be material to the shareholders in deciding whether to re-elect directors,* we conclude that plaintiff's complaint was prematurely dismissed" (emphasis added)).

Many corporate actions taken by directors in the interest of the corporation might offend and engender controversy among some stockholders. Investors share the same diversity of social and political views that characterizes the polity as a whole. The tenor of a company's labor relations policies,[29] economic decisions to relocate or close established industrial plants, commercial dealings with foreign countries which are disdained in certain circles, decisions to develop (or not to develop) particular natural resources or forms of energy technology, and the promulgation of corporate personnel policies that reject (or embrace) the principle of affirmative action, are just a few examples of business judgments, soundly entrusted to the broad discretion of the directors, which may nonetheless cause shareholder dissent and provoke claims of "wasteful," "unethical," or even "immoral" business dealings. Should corporate directors have a duty under § 14(a) to disclose all such corporate decisions in proxy solicitations for their re-election?[30] We decline to extend the duty of disclosure under § 14(a) to these situations. While we neither condone nor condemn these and similar types of corporate conduct (including the now-illegal practice of questionable foreign

26. Illegal foreign payments cases clearly involve state law questions of breach of fiduciary duties. They should not be dealt with under the general disclosure provisions of the federal securities laws where it is apparent, as here, that the nondisclosure of such payments had little, if any, impact on the plaintiff's dealings in the corporation's stock. Several recent cases involving illegal foreign payments have adopted this rationale in dismissing the plaintiff's cause of action for failure to state a claim under § 13(a) or § 14(a).

603 F.2d at 731.

27. [T]he injuries of which plaintiff complains in these claims are the elections themselves: he seeks to have the elections overturned on account of alleged nondisclosure of certain directors' remuneration. *Since remuneration may be a matter of especial interest in the election of directors, and is indeed the subject of special regulations under § 14(a) . . . there appears to be alleged a sufficient causal link between the claimed nondisclosures in the proxy statements and the elections which the statements sought to influence.*

615 F.2d at 65–66 (emphasis added). Presumably the court in *Galef* meant that matters of director compensation are material because of the potential for self-dealing. *Cf.* note 23 *supra* (distinguishing between causation and materiality).

28. *See Abbey,* 603 F.2d at 731; note 33 *infra.*

29. *Amalgamated Clothing and Textile Workers Union v. J.P. Stevens & Co.,* 475 F.Supp. 328

(S.D.N.Y.1979) is perhaps the quintessential example of shareholders' creative—and inappropriate—use of the federal securities laws to attempt to regulate the normative content of corporate policies and management business decisions. *Cf.* Note, *supra* note 6, at 1856–70 (requiring disclosure for the primary purpose of modifying substantive corporate behavior is not authorized by the statutory language empowering the SEC to require reporting for the protection of investors); Comment, *supra* note 24, at 259–61 (same).

30. Gaines contends that the distinction between director self-dealing and other forms of director misconduct is irrelevant in equitable actions under § 14(a) when the *election* is the challenged "transaction." Gaines posits that while "it would improperly distort the federal securities laws to allow *damage* actions by shareholders for these disclosure failures," the potential for "swallowing" state law standards of care does not exist in *equitable* actions. We disagree. The federalizing effect of granting shareholders such an equitable § 14(a) cause of action would be *even greater* than in the damages context because no pecuniary injury to the corporation would be required to state a claim. Disgruntled shareholders could, in effect, compel a plebiscite on every potentially controversial corporate decision, regardless of the directors' compliance with state law standards of fiduciary duty or the absence of any significant monetary stake. *See* note 24 *supra* & note 33 *infra.*

payments), we believe that aggrieved shareholders have sufficient recourse to state law claims against the responsible directors and, if all else fails, can sell or trade their stock in the offending corporation in favor of an enterprise more compatible with their own personal goals and values.[31]

Absent credible allegations of self-dealing by the directors or dishonesty or deceit which inures to the direct, personal benefit of the directors—a fact that demonstrates a betrayal of trust to the corporation and shareholders and the director's essential unfitness for corporate stewardship—we hold that director misconduct of the type traditionally regulated by state corporate law need not be disclosed in proxy solicitations for director elections. This type of mismanagement, unadorned by self-dealing, is simply not material or otherwise within the ambit of the federal securities laws. *Golub v. PPD Corp.,* 576 F.2d 759, 764–65 (8th Cir. 1978); *see Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1221, 1222 (9th Cir. 1980). A contrary holding would place an unwarranted premium on the form rather than the substance of a shareholder's complaint [32] and, moreover, would represent a move toward the federalization of corporate law that the Supreme Court has repeatedly and emphatically rejected.[33]

Accordingly, we affirm the dismissal of Gaines' equitable § 14(a) claim relating to the election of Lockheed directors because the character of the alleged nondisclosures was immaterial as a matter of law.

---

**31.** *See generally* Pilon, *Corporations and Rights: On Treating Corporate People Justly,* 13 Ga.L.Rev. 1245, 1297–1335, 1339–69 (1979); Winter, *State Law, Shareholder Protection, and the Theory of the Corporation,* 6 J. Legal Stud. 251 (1977).

**32.** *Cf. Herman v. Beretta,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,574 (S.D.N.Y. 1978), at 94,408:

Plaintiff seeks to distinguish the instant case [from the damages situation] on the basis of the relief sought here: damages and the voiding of all "tainted" elections. The request for an additional remedy, *i. e.,* the voiding of elections, does not cure the defect in plaintiff's Section 14(a) claim. This Court has not found, nor has plaintiff provided, any precedent or persuasive arguments why injunctive relief should be available to a plaintiff whose complaint fails to meet the "transaction causation" requirement.

**33.** In *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 477–80, 97 S.Ct. 1292, 1302–05, 51 L.Ed. 480 (1977), the Supreme Court refused to find an implied cause of action under rule 10b–5 because the essence of the complaint was a breach of fiduciary duty of the type traditionally regulated by state law. Expanding implied causes of action under the federal securities law to encompass tangentially implicated instances of mismanagement would, the Court said, exceed Congress' intent, pose a danger of vexatious shareholder litigation, and create potentially insoluble conflicts between state and federal standards. "[W]e are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden." *Id.* at 479, 97 S.Ct. at 1304. *See Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 40–41, 97 S.Ct. 926, 948–949, 51 L.Ed.2d 124 (1977) (defeated tender-offeror relegated to state law remedies in lieu of expanding § 14(e) cause of action); *Cort v. Ash,* 422 U.S. 66, 78, 84, 95 S.Ct. 2080, 2087, 2091, 45 L.Ed.2d 26 (1975) (corporations are creatures of state law; one of the four factors used to determine whether to imply a private cause of action from a federal statute not expressly providing one is whether "the cause of action [is] one traditionally relegated to state law, in an area basically the concern of the States"); *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971) (by § 10(b) Congress did not seek to regulate transactions "which constitute no more than internal corporate mismanagement").

We agree with the position taken in *Golub v. PPD Corp.,* 576 F.2d 759, 764 (8th Cir. 1978):

[I]t was not the purpose of the federal security laws to provide a federal cause of action for stockholders who have been damaged by mere corporate mismanagement or breach of fiduciary duty by those in charge of the affairs of the corporation. Controversies in those areas have traditionally been the subject of litigation in the state courts . . . .

*Accord, Panter v. Marshall Field & Co.,* 646 F.2d 271, at 282–287 (7th Cir. 1981); *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 723 (2d Cir.) (Meskill, J., dissenting), *cert. denied,* —— U.S. ——, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980); *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641, 651–61 (3d Cir. 1980) (Aldisert, J., dissenting); *Abbey v. Control Data Corp.,* 603 F.2d at 731. *See generally* Ferrara & Steinberg, *A Reappraisal of Santa Fe: Rule 10b–5 and the New Federalism,* 129 U.Pa.L.Rev. 263 (1980).

## CONCLUSION

For the reasons adduced herein, we affirm the District Court's order of summary judgment on Gaines' derivative state law claims. There is no need for remand. Gaines' allegations do not state an actionable § 14(a) claim, and thus his federal securities claim was correctly dismissed under Rule 12(b)(6).

AFFIRMED.